Andrew Brymer et al. v. The Butler Water Co., Appellant.

[Marked to be reported.]

*Water companies—Supply of impure water—Water rents—Equity - Injunction—Act of April 29, 1874, sec. 34.*

A water company incorporated under the act of April 29, 1874, P. L. 93, will be enjoined from collecting water rents where the company has supplied water utterly unfit for domestic use or for steam purposes.

It is inequitable that a corporation chartered to serve a public use, and actually undertaking to serve the public with one of the necessaries of

life, should be allowed to collect the price of a supply of good water from those to whom it delivers an article that cannot be used, or be made fit for use by any process within their knowledge or reach.

A water company is not bound to provide water that is chemically pure, but water that is ordinarily and reasonably pure. After having secured a proper source of supply, the company is bound to exercise diligence in the effort to preserve the water from pollution and to deliver it to the public in no worse condition than that in which it is taken from the source of supply.

Where the source of supply of a water company is polluted by upper riparian owners pouring salt water from oil wells into the stream, rendering the water unfit for domestic use or steam purposes, the court can decree that the company shall not collect water rents, but it cannot, if the upper owners have a right to pollute the stream, decree that the company must obtain its supply from some other designated point. In such a case the discretion lies with the company to elect whether it will go out of business, or seek some new and independent source of supply.

Argued Oct. 24, 1895. Appeal, No. 244, Oct. T., 1895, by defendant, from decree of C. P. Butler Co., June T., 1895, No. 2, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity to restrain the collection of water rents and to compel a water company to supply better water.

The bill averred that plaintiffs were citizens of the borough of Butler, and that the defendant was a corporation organized under the act of April 29, 1874, for the purpose of supplying the borough of Butler with pure water, and that the said corporation by its charter and ordinances of the borough had the exclusive right to furnish the supply of water to the citizens of the said borough. The bill further averred as follows:

"4. That the said The Butler Water Company derives its supply of water as furnished by it to your orators and the citizens of the said borough of Butler solely and alone from the waters of the Connoquenessing creek, which waters are muddy, filthy, impure and unclean in character and quality, and insufficient and deficient in quantity to supply your orators and the citizens of the said borough with pure water.

"5. That the said Connoquenessing creek does not furnish a full, sufficient and adequate supply of good, pure, clean and healthful water to your orators and the citizens of the said borough for fire, steam, sewage, and domestic purposes as furnished your orators by the said The Butler Water Company.

" 6. That the said borough of Butler, Pa., contains about ten thousand inhabitants and is built on and near the banks of the said Connoquenessing creek, which is the sole and only source from which the said The Butler Water Company seeks to supply your orators and the inhabitants of the said borough with water, the said creek being nothing more than the natural drainage sewer for the valley through which it flows and the water sheds adjacent thereto.

" 7. That the said Butler Water Company does not and has not furnished a sufficient supply of pure water for the use of the orators, citizens of the said borough, but on the contrary the supply of the water as furnished by the said The Butler Water Company is and has been insufficient, impure, filthy and absolutely unfit for use for domestic and other purposes.

" 8. That the pipes, reservoir and source of supply of said Butler Water Company are and have been for a long time in a dirty, muddy, filthy and impure condition.

" 9. That said Butler Water Company has not heretofore nor does it now properly filter the water furnished your orators and citizens of the said borough, either before pumping the same from the said creek into the reservoir or before passing the water from the said reservoir into the supply pipes or mains.

" 10. That the schedule of rates and charges or water rents assessed, charged and collected by the said The Butler Water Company for the water furnished by it to your orators and the citizens of the said borough who use the water so furnished has been and still is excessive, unfair, unjust, extortionate, oppressive, lacks uniformity and is unequal.

" 11. Wherefore your orators, alleging that they have no remedy at law, pray your Honor :

" A. To hear, inquire and determine as to the impurity and deficiency of the water supply as furnished your orators and citizens of the said borough of Butler by the said The Butler Water Company.

" B. To hear, inquire and determine as to the charges of the said The Butler Water Company for the water so furnished your orators.

" C. To make such order in the premises as may seem just and equitable and to compel the said corporation, The Butler Water Company, to correct the evils complained of by your orators.

" D.   To decree that the charges of said Butler Water Company assessed and charged to each of your orators shall be decreased as to the said court may seem just and equitable.

" E.   That the said Butler Water Company, defendant, be decreed to pay the cost of this proceeding.

" F.   For such other and further relief as your honor shall deem just and equitable and the nature of the case shall require."

The answer averred, inter alia, as follows:

" 4.  We admit that the sole supply of water of the defendant company, as at present conducted, is the Connoquenessing creek, but we deny that the waters thereof are muddy, filthy, impure and unclean in character and quality or insufficient or deficient in quantity to supply the plaintiffs and citizens of the borough of Butler with pure water.   We qualify this answer, however, by adding that about January last Russell & McNally commenced pumping salt water from an oil well operated by them upon the ground at their well, from whence it finds its way into the Connoquenessing creek, and have since continued to pump the same; that the Independent Gas Company have also commenced to pump salt water into the creek from a well operated by them, both under claims of right so to do.   The salt water so pumped from these wells does or will render the waters of said creek impure, especially when the water is at a low stage; but for the purpose of preventing this impurity we have filed a bill in equity to March term, 1895, which is still pending.

" 6.  We neither admit nor deny the sixth paragraph in plaintiffs' bill, but if by use of the word 'sewer' it is intended to convey the idea that the water is contaminated and sewage is carried, then it is denied.

" 9.  We deny the necessity of a filter, as the water furnished by us is pure, wholesome and fit for public and domestic use, as described in paragraph 4 hereof.

"10.  The rates, charges, or water rents assessed, charged and collected by us for water furnished to the plaintiffs and to the citizens of Butler are not excessive, unfair, unjust, extortionate, oppressive or unequal, and do not lack uniformity."

The evidence tended to show that the water supplied by defendant was unfit for domestic use and for steam purposes.

GREER, P. J., filed an opinion which was in part as follows:

4. That the defendant company from the date of its organization to the present time has not wholly neglected, failed and refused to furnish to the inhabitants of the borough of Butler a sufficient supply of pure water as required by the provisions of the statute under which it is incorporated, as well as under its charter. The supply for nine months in the year has generally been sufficient and ordinarily good and pure, but during two or three months in the dry season of the year the supply has not been sufficient, nor has the water been reasonably and ordinarily pure and wholesome. During the summers of 1893 and 1894 the supply was especially limited and the quality very impure and unwholesome.

5. That in the summer of 1893 grass and weeds were allowed to grow in the reservoir, which was unfenced, and in which dogs were permitted to swim and wash.

6. That the cistern from which the water was pumped into the reservoir consisted of a round hole in the ground, walled around with stone, not close, which was permitted to fill with slime and filth, which cistern remained so for a long period of time.

7. That the cistern from which the unfiltered water was pumped into the reservoir of the company in 1893 was permitted to remain in an unusual filthy condition, containing slime and large quantities of unwholesome and filthy matter; that within sixty feet of the said cistern was a hog pen, and within twenty or thirty feet was a stable with manure and other unwholesome matter surrounding it in a most filthy condition, and near it was a privy or water closet in a filthy and bad condition; all these things remaining on higher ground than the cistern, and at one time negligently suffered a dead horse to remain for several days in the upper end of the dam from which the water was pumped into the reservoir.

8. That the said company, although notified and requested by the board of health to remove and repair the condition of things in the neighborhood of this cistern, neglected and refused to do so.

9. That the water furnished by the said company to the inhabitants of the said borough of Butler is and has been from the date of its organization, at times, muddy, filthy, impure and unclean in character and quality, insufficient in quantity for the uses and purposes of the inhabitants of said borough.

10. That in the late fall and winter season the water fur-nished by the said company was reasonably good and whole-some, yet was frequently muddy, but during the summer and early fall it was generally deficient in quantity and unclean and unwholesome in quality.

11. That said defendant company was indifferent as to its duty and careless and negligent in its management of the busi-ness, and has almost entirely failed to comply with and carry out the purposes of its organization, in that it has not con-structed and maintained a sufficient plant with the necessary appliances for said purpose.

12. That the place and source from which the defendant company has been obtaining the water to supply the plaintiffs from its incorporation to the present time is, at times, muddy and filthy, and during two or three months of the year is im-pure and unfit for domestic and other purposes, and during which times it is insufficient in quantity.

13. That a sufficient supply of pure water can be obtained from other sources than the Connoquenessing creek within a reasonable distance from the borough of Butler and at a reason-able cost and outlay, so as to make it practicable for said com-pany to comply with the purposes of its organization.

14. That before the erection of the waterworks at Butler the citizens of said borough were supplied by water from water wells and from the Connoquenessing creek, the water from the creek being used for washing purposes and the water from the wells for domestic uses, at which time the population of the said borough would not exceed three thousand people, whilst the present inhabitants number nearly ten thousand.

15. That the deficiency in the quantity of water supply and its quality is the result of extreme drouth, failure of rain and indifference and negligence on the part of the defendant com-pany in failing to store and husband the flow of water in the stream, so as to provide for dry seasons.

16. That the defendant company has not furnished the waters of the Connoquenessing creek fully and fairly to the extent of its flow, but has refused to filter and neglected to furnish the same as pure and clean as could have been done by care, atten-tion and a reasonable expenditure of money, and the said com-pany has not made such reasonable and fair effort to obtain other pure supplies as could reasonably have been done by it.

17. That the water furnished to the consumers for nine months in the year has been wholesome and fairly and reasonably pure, at times muddy and unclean, but during two or three months, the dry season, it was impure and unwholesome, sometimes so much so that it was accompanied with a foul stench to such an extent that it was almost sickening for persons to be in a bath room when it was drawn from the spigots.

18. That the present impurities occasioned by the salt water which flows into Connoquenessing creek from oil wells drilled by parties along the banks of the creek, began in February and the flow therefrom yet continues, and the defendant company filed a bill in equity to restrain the parties drilling the wells from corrupting the waters with the salt water, which proceeding is pending and undisposed of.

19. That the failure to furnish pure water in sufficient quantities has been wholly brought about by acts or negligence on part of the respondent. During the extreme dry weather in the summer months the stream becomes very low and filthy and the water impure and unfit for domestic uses, during which times the company wholly neglected to remedy its condition or produce water from other sources which were within its power and could have been done by a reasonable outlay of money.

20. That the water furnished to the inhabitants of the borough of Butler was not at all times wholesome and ordinarily pure prior to the introduction of salt water into the Connoquenessing creek. No sickness has been traced to its use, while typhoid fever and other diseases have been traced to the use of well water, from dug wells.

21. That a large proportion of the water furnished in the summer season is from the wash and sewerage of the roads, fields and country within the bounds of the watershed and is not of such quality as should be used for culinary and domestic purposes, especially when furnished without filtering.

22. That of late years the average daily consumption of water by the inhabitants of Butler was over eight hundred thousand gallons.

23. That about the first of February, 1895, persons drilling oil and gas wells on the watershed of the Connoquenessing creek have been emptying salt water into the said stream at

the rate of from eight to ten thousand barrels a day up until the present time, and polluting the water to such an extent that it is entirely unfit for domestic use ; that it corrodes and eats the pipes through which it passes and can only be used for flushing the sewers of the borough, water closets, and for extinguishment of fires, and is not sufficient in quantity for these purposes ; during the nighttime it is turned off the hotels and houses and the water closets are suffered to remain without flushing until morning.

24. The watershed of the Connoquenessing creek from which the water has been furnished by the water company to the people of Butler extends some nine or ten miles north and northeast of Butler borough and contains thirteen thousand, eight hundred and eighty (13,880) acres of land.

25. That in addition to this, Bonniebrook, a stream coming from the east, empties into the Connoquenessing a little below its present dam and has a watershed containing five thousand one hundred (5,100) acres.

26. That an estimate of the yearly waterfall at the rate of thirty-six inches per year on the watersheds of Connoquenessing and Bonniebrook will produce 19,549,728,000 gallons of water, or 53,560,898 gallons per day.

27. Estimating that the waste by absorption, evaporation and leakage will amount to fifty per cent, or one half of this amount, 53,560,898 gallons per day, we have remaining a daily supply of 26,780,449 gallons, more than twenty-six times the amount of water at any time pumped into the reservoir daily.

28. Estimating the population of Butler at 10,000 and allowing 150 gallons per day per capita for 365 days in the year, the amount of water required for a sufficient supply is 552,500,000 gallons per year or about 1,500.000 gallons per day.

29. That the several watersheds of Connoquenessing creek and its tributaries, with a rainfall of thirty-two inches per year will furnish a sufficient supply of water for ten times the population of Butler as estimated, if properly handled and stored.

30. That Butler is sixteen miles from the Allegheny river at Monterey and about eighteen or nineteen miles from Parker, and a water line with pumps, engines, etc., can be erected to either of these points at a cost of from one hundred and twenty-five to one hundred and fifty or seventy-five thousand dollars,

which would not be unreasonable or impracticable, considering the size, growth and requirements of the borough of Butler.

31. That the defendant's application for a charter, recorded in Charter Book No. 1, page 134, provides that "the business of said corporation is to be transacted in the borough of Butler, in the county of Butler and state of Pennsylvania."

32. That the directors and officers of the said defendant company did not transact all business of their said company at Butler borough, Butler county, Pa., as provided in their application for charter, but held frequent meetings of the directors at Kittanning, in Armstrong county, Pa., where important business of the company was transacted.

33. That the important books of the company were not kept in Butler borough, Butler county, Pa., but were kept at Kittanning, Armstrong county, Pa., some forty miles away.

34. That on the 8th day of July, 1895, the court of common pleas of Butler county, sitting in equity, made an interlocutory decree commanding and directing the said Butler Water Company, defendant, to provide, secure and furnish a sufficient supply of pure water to the plaintiffs in this case and the inhabitants of Butler borough on or before August 15, 1895.

35. That the said water company and its directors, officers, superintendents and managers have willfully and negligently disregarded the mandates of the law under which the said company was organized and its charter granted, and has failed and refused to at all times furnish a sufficient quantity of pure water —water that is wholesome and ordinarily pure, to the citizens of Butler, Butler county, Pa., and the plaintiffs in this case.

36. That the said company, its officers, directors, etc., have utterly disregarded the order of the court made on the 8th of July, ordering and directing the furnishing and providing of a sufficient supply of pure water and have been guilty of contempt of court.

37. That the said company, its officers, directors, superintendents, etc., have not, since the 8th of July, 1895, nor since the 15th of August, 1895, the time given to perform the order of court, made a reasonable effort to provide, furnish and supply the water as commanded to do, but have unnecessarily delayed the same and have been utterly regardless of the order of the

court, the rights of the plaintiffs, the health and welfare of the citizens.

38. That the inhabitants of the borough of Butler and the plaintiffs are suffering greatly for the want of a sufficient supply of pure and wholesome water, and there is great danger of sickness and disease disastrously spreading over the town. The people are compelled to use water for drinking and domestic and culinary purposes from dug wells, which are unwholesome and dangerous to life and health and to which diphtheria and typhoid fever have been traced, and from drilled wells, the character of which is at least questionable. Some are being supplied by persons hauling with wagons and others are carrying from a long distance at great inconvenience.

39. That all indulgences by the court, extensions of time and courtesies on the part of the plaintiffs in this bill have been disregarded and disrespected by this company defendant, and it becomes the important duty of the court to use such power as it may have in its hands to compel respect for the law and obedience to the order of court.

### CONCLUSIONS OF LAW.

From a careful consideration of this case, I have reached the following conclusions of law, which seem to me to apply to the facts as found:

1. The word " pure " in the act of 1874, under which this bill was filed, means ordinarily pure and wholesome water, and not absolutely and chemically pure.

2. That the impurity and deficiency of the water complained of and shown by the testimony in this case are such evils as are contemplated by the act of 1874, and therefore this bill should be sustained.

3. That the water furnished prior to the introduction of the salt water was not ordinarily pure and wholesome during the entire year, but during three months—the summer season—it was impure, unwholesome and unfit for domestic and culinary purposes, and the court has power, under the act of 1874, to make an order on the respondents to furnish pure water. The act legally construed relates to an evil within the power of the respondents to correct, and in this case the respondents have

had, and still have it within their power to correct these evils, but they have willfully refused and failed to make such effort as they reasonably should have done under the circumstances and have shown a spirit of obstinacy which lacks liberality, enterprise and due regard for the health, comfort and safety of their patrons, these plaintiffs, and other citizens of the borough of Butler.

4. That each of the plaintiffs in .this bill is entitled to the relief prayed for, to wit: a sufficient supply of pure water, and it is the duty of the respondents, under the act of the 29th of April, 1874, to furnish a sufficient supply of pure and wholesome water.

Owing to the negligent conduct, the unnecessary and unreasonable delays, the willful disregard for law, the stubborn disobedience to the orders and decrees of court, the utter indifference and disregard for the health, comfort and absolutely necessary demands of the people on the part of the defendant company, it becomes the duty of the court to make such order in the premises as may seem just and equitable and compel this corporation to correct the evil so properly complained of by the plaintiffs. The respondents have been guilty of willful contempt of court, and have deliberately defied the laws of this commonwealth in regard to their duty under the act of assembly by which their corporation was created and their franchise granted. Stern measures on the part of the court are now imperative to spare the people of the borough of Butler from an epidemic and a disastrous future. Men who have this high power under the laws of our commonwealth, the right of eminent domain to enter upon, take and use the lands of others for the purposes of their business, must exhibit more enterprise, liberality and willingness to perform the duties which they have assumed toward their patrons and the public.

The hearing in this case was commenced on the 6th of June. After two days' work it was, on motion of the respondents, continued two weeks. It was again continued on their motion, and again put off at their asking. The court listened to arguments for two days, and the case closed on July 3, 1895. On the 8th of July an interlocutory decree or order was made and filed giving the defendants until August 15th to perform this important work. No active steps were taken in this direction

until the latter part of July.   No reasonable and practical effort was made toward correcting the evils complained of until within a short time of the expiration of the period given by the court.

It now becomes the duty of this court to make an order and decree upon the Butler Water Company, defendant, its directors, officers, superintendents and managers to at all times from this day furnish pure water in sufficient quantities to supply the necessary demands and wants of the plaintiffs and other inhabitants of Butler who may desire to use the same, and to transact the business of said company at the borough of Butler, Butler county, Pa., according to the provisions in the application for their charter, and it is also ordered that from February 1, 1895, until pure water in a sufficient quantity is furnished as aforesaid, no rates or charges shall be made or collected of the patrons of said corporation, except for water furnished to extinguish fires, to flush the sewers of the borough, and to flush water closets in the public buildings, hotels and private houses, which shall be the present rates charged by the said company defendant, and that the defendant company pay the costs in this proceeding.

The court entered the following :

And now, to wit, September 14, 1895, this case having been fully heard by the court, without reference to a master and the findings of fact, conclusions of law and opinion of court, filed, it is ordered, adjudged and decreed as follows :

1. That the Butler Water Company, defendant, has willfully and negligently failed, refused and neglected to furnish the inhabitants of the borough of Butler, Pa., and the patrons of said company with a sufficient supply of pure (reasonably pure) water.

2. That from February 1, 1895, until pure (reasonably pure) water in sufficient quantity is furnished by the Butler Water Company to its patrons, no rates or charges shall be made or collected from consumers, except for water furnished to extinguish fires, to flush the sewers of the borough and to flush water closets in the public buildings, hotels and private houses, which shall be at the present rates charged by the defendant company.

3. That the defendant company at once and forthwith secure

and provide, and at all times furnish a sufficient supply of pure (reasonably pure) water to the inhabitants of the said borough of Butler, Pa., and patrons of the said defendant company.

4. That the defendant company be, and are, hereby ordered and required to keep and maintain the principal office of said company within the said borough of Butler, Pa.

5. That the defendant company pay the costs of these proceedings.

*Errors assigned* among others were as to various findings of facts, and the decree of the court as above.

*T. C. Campbell* and *John M. Thompson, James B. Neale, W. C. Thompson* and *Lev. McQuistion* with them, for appellant.—The remedy by bill in equity under the act of 1874, is but a substitute for the remedy given by writ of mandamus. But a writ of mandamus is frequently denied where specific performance of an alleged duty to the public is sought. In such cases, if the duty is not performed, the public is left to its remedy of quo warranto for forfeiture of charter—thus it will be denied where the attempt to enforce the obligation would prove unavailing, where the duty is complicated and involves discretion and technical skill, or where performance is not within the power of the defendant company : Morawetz on Priv. Corp., sec. 1134; 14 Am. & Eng. Ency. of Law, 158 ; Ohio Ry. Co. v. People, 120 Ill. 200; Danforth v. Phila. & Cape May R. R., 30 N. J. Eq. 12.

In decreeing specific performance, a court of equity cannot enter a general decree that in future the delinquent party shall perform the acts required of him by his contract. Such a decree would be too general and indefinite : Atlanta etc. R. R. v. Speer, 32 Geo. 550.

Governed by the rules governing the issue of writs of mandamus, any decree looking to the construction and maintenance of a line to the Allegheny river should not be signed or entered because : 1st. The construction and maintenance of such a line is complicated, involves discretion and technical skill and is beyond the power of the defendant company as it is at present constituted—that is, with its present capital—and is not practicable as an investment. 2d. There is not sufficient

proof in the case that the waters so obtained would be an improvement on the waters heretofore furnished, and the court, before requiring the outlay of so much money, should be satisfied that the new supply would be much more satisfactory.

We must construe the word "pure" used in the act of assembly to mean "wholesome, ordinarily pure:" Com. v. The Towanda Water Works, 22 W. N. C. 429.

*Andrew G. Williams* and *Clarence Walker, W. A. Forquer S. F. Bowser* and *R. P. Scott* with them, for appellees.

OPINION BY MR. JUSTICE WILLIAMS, January 6, 1896:

This bill was filed under the provisions of the corporation act of 1874. It alleges the incorporation of the company defendant in pursuance of the provisions of that act as a water company; the fact that it has been engaged in furnishing a supply of water to the borough of Butler for about seventeen years; and that the water furnished during the dry weather of 1893 and 1894 was muddy and unfit for domestic use, and that the water then being furnished was "impure, filthy and absolutely unfit for use for domestic or other purposes." The answer denies that the waters of the Connoquenessing creek, from which the supply for Butler borough has been taken, are either muddy or impure as they ought to be allowed to flow, but admits that certain persons have for some months been pumping large quantities of salt water from an oil well or wells out upon the surface of the ground which has found its way into the stream and rendered its waters, especially when the stream is low, impure and unfit for domestic use; and asserts that it has instituted proceedings in equity to restrain such persons from polluting the stream and destroying the water supply.

The case was fully heard in the court below. The learned judge had before him in the first place the question of the quantity and quality of the water furnished by the defendant company. If the quantity was found to be inadequate or the quality so poor as to be unfit for use he was next to consider whether the trouble could be remedied by a reasonable expenditure of money and effort on the part of the company. If he found this fact also in favor of the plaintiffs, it became his duty to make such order as would quicken the diligence of the water

company and protect the public served by it. After hearing the evidence the learned judge found as a fact that except during the very dry weather in the summers of 1893 and 1894 the supply had been reasonably sufficient in quantity and reasonably pure in quality. He found that by a better system of storage, the waters of the Connoquenessing could be made to furnish an ample supply, and that by securing the waters of a tributary called Bonniebrook the supply at command would be several times as great as the population of Butler would require. He also found that the water had been for some months so charged with salt and other minerals from the oil wells as to be absolutely unfit for domestic purposes or for steam, and he enjoined the defendant from collecting water rents except for the flushing of closets and sewers, and for fire purposes. He at the same time made a peremptory order on the company requiring it " to secure and provide forthwith a sufficient supply of reasonably pure water to the inhabitants of Butler borough and patrons of the said defendant company." The decree and the findings on which it rests are now assigned as error, and it has been necessary for us to examine the evidence at length in order to determine whether it will support the several findings complained of. This examination has satisfied us that with what has been done to reach the waters of the Bonniebrook the supply must be ample, but that the water has been destroyed for domestic and for steam purposes by the owners and lessees of land along the stream in the effort to obtain petroleum oil from an underlying stratum of sand rock known as the "one hundred foot sand." We are also satisfied that it will be wholly out of the question for the defendant to obey the order requiring it to furnish pure water to its patrons, if the pollution of the stream by the owners and lessees of land in the basin of the Connoquenessing is a subject over which a court of equity has no control. This question is involved in the Butler Water Company and the Commonwealth of Pennsylvania ex rel. v. Russell et al., which was argued together with this case, and it will be considered to some extent in the opinion to be filed therein.

We shall confine ourselves in this case to the two questions that are peculiar to it. First, does the evidence justify the injunction against the collection of water rents for domestic and

for steam purposes? We think the conclusion reached by the learned judge that the water was utterly unfit for domestic use, that domestic animals would not use it, and that it was so destructive to the pipes in which it was conveyed and to the flues of boilers in which it was converted into steam as to be unsafe for use for steam purposes, has evidence on which it can fairly rest, and that it supports the restraining order. It is inequitable that a corporation chartered to serve a "public use" and actually undertaking to serve the public with one of the necessaries of life should be allowed to collect the price of a supply of good water from those to whom it delivers an article that cannot be used, or be made fit for use by any process within their knowledge or reach.

The relations between the defendant and its customers rest on contract, and if the commodity bargained for is not delivered it is elementary law that the price is not recoverable. Nor was the learned judge mistaken in the measure of the duty imposed by law on the defendant. It is not bound to provide water that is chemically pure, but water that is ordinarily and reasonably pure. The water for the supply of a city must be taken from some lake or stream or watershed that is accessible, that has not been destroyed, and that can furnish a sufficient quantity to meet the demand. After having secured such a source of supply the company is bound to exercise diligence in the effort to preserve it from pollution and to deliver it to the public in no worse condition than that in which it is taken from the source of supply. Practically it is unimportant whether the water becomes unfit for use because of the neglect, or in spite of the vigilance of the company. The question to be considered as between the seller and buyer is, What is the fact? Is the water fit for use? The same question is also to be investigated by the court on behalf of the public. Is the company meeting the objects of its organization and discharging its duty to the state by fairly serving the public use to which it is required to minister? If this question must be answered in the negative then the remedy is to order the company to render better service, and to suspend its right to collect rents until water is furnished that can be used with reasonable safety to its customers. If it shall be determined that the defendant and the public are alike remediless, and that the pollution of the stream must go

on without check or regulation by the courts, just so long as it may suit the landowners to pump salt water into it, the result will be the practical confiscation of the entire plant of the water company, and of the natural water supply for ten thousand people, for the benefit of a few persons. In this event the company may be compelled by its own business necessities to elect whether it will go out of business or seek some new and independent source of supply. This is a question which, if the necessity arises the company must settle for itself. The court cannot make the election for it. Whether it shall move some eighteen miles to the Allegheny river at an expense probably twice as great as the amount of its capital stock, is a question with which the court has absolutely nothing to do. The court may say "the water you furnish is unfit for use. You shall not collect pay for that which has no value." But it cannot point out a possible supply at some other point and say "you must let go your present source of supply and remove to that which we point out." This disposes of the second question raised by this appeal and distinguishes between the discretion conferred upon the court by the act of 1874 and the business discretion of the owners of the plant of the water company.

The company may select the source of supply, may determine a system of collection and distribution, a mode of storage, and control generally the business details. The court may investigate the efficiency of the system and the quantity and quality of the water furnished, and make such order as may be necessary and just for the protection of the public. We cannot resist the impression that the learned judge took a somewhat harsh and uncharitable view of the conduct of the water company. The pressing evil from which the public suffered was the destruction of the water supply by the oil operators. This the defendant could only correct through the action of the court below, which it had invoked and the result of which it must necessarily abide. Its own investment of $100,000, its business, and in a practical sense its franchises were all at stake. It had nothing to make but much to lose by temporizing, and we can readily understand how, without the assistance of the court, the officers of the company might feel that there was nothing they could do to save the public or themselves from heavy loss. Any temporary expedient may well have seemed to them a useless

expenditure of money, so long as the pumps were pouring out a continuous stream of water loaded with salt and other injurious minerals into the source of supply. But if it be assumed that the officers of the company intended no disrespect or insubordination, but did in good faith all, or more than the court should have required of them, still the fact remains that the water had been polluted and was clearly unfit for use. That they were unable to remedy this condition or to furnish what their patrons had a right to expect and demand. They had no equitable right therefore to collect pay for what they did not and could not supply. So much of the decree as directed the company to furnish reasonably pure water is a mere declaration of the defendants' legal duty ; so much of it as enjoins the collection of rents for water that cannot be used is an appropriate method for compelling the discharge of that duty and for the protection of the public meantime.

The decree must be affirmed at the costs of the appellant.