# Andrew Brymer et al. *v.* Butler Water Company, Appellant.

[Marked to be reported.]

| 179 | 231 |
|-----|-----|
| 19 SC | 354 |

| 179 | 231 |
|-----|-----|
| d219 | 265 |

| 179 . | 231 |
|-----|-----|
| 220 | ³114 |
| 220 | ³115 |
| j220 | ³134 |

*Corporations—Water companies.*

The ownership of property by a corporation is as absolute and comprehensive as that by a private citizen. It includes the right to put a value upon its property, and to determine on what terms it will part with it, or supply its customers with the commodity in which it deals, in the same manner that an individual or a partnership could do. But as the corporation derives its existence and its powers and franchises from the state, it is more directly accountable to the state than a natural person now is, under existing laws, for the exercise of good faith in the conduct of its business and for the reasonableness of its charges.

*Corporations—Water companies—Supervisory power of courts—Acts of April, 29, 1874 and June 2, 1887.*

The supervisory power over water companies conferred upon the courts by the acts of April 29, 1874, P. L. 95, and June 2, 1887, P. L. 311, does not justify the court in preparing a tariff of water rents, and commanding a corporation to furnish water to the public at the rates so fixed, as this would involve a transfer of the management of the property and the business of a solvent corporation from its owners to a court of equity, for no other reason than that the court regarded some one or more of the charges made by the company as too high.

*Water company—Reasonable charges—Stock issued to stockholders in lieu of cash.*

Water companies are entitled to a rate of return, if their property will earn it, not less than the legal rate of interest; and a system of charges that yields no more income than is fairly required to maintain the plant,

pay fixed charges and operating expenses, provide a suitable sinking fund for the payment of debts, and pay a fair profit to the owners of the property cannot be said to be unreasonable, and will be sustained by the courts.

In determining what is a proper charge to be made by a water company, and in ascertaining for that purpose the amount of the investment by the stockholders, it can make no difference that money earned by the corporation and in a position to be distributed by a dividend, was used to pay for improvements, and that stock was issued in lieu of cash to the stockholders. In such a case it is not necessary that the money should be first paid to the stockholder, and then returned by him in payment for new stock issued to him.

*Water companies—Power of courts to regulate schedule of prices.*

A water company was enjoined from collecting rents until it should supply water to its customers suitable in quality, and sufficient in quantity. The company having improved its sources of supply presented a petition to the court praying that it might be permitted to collect water rents from its customers in accordance with a schedule presented to the court. After investigation the court found that the company was entitled to charge and collect water rents, but it refused to approve the schedule presented by the company, and prepared another schedule which it directed the company to follow. *Held*, (1) that the court had no power to prepare a schedule of rates, and enforce its observance by the company; (2) that it was the duty of the company in the first place to prepare a schedule of rates, and if a customer was aggrieved thereby he could petition the court and have the rates decreased if improper.

Argued Oct. 21, 1896. Appeal, No. 182, Oct. T., 1896, by defendant, from decree of C. P. Butler Co., on bill in equity. Before GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed in part.

Bill in equity for an injunction.

The case was previously reported in 172 Pa. 489.

From the record it appeared that on March 9, 1896, the Butler Water Company which had been previously enjoined from collecting water rents, presented its petition to the court, setting forth that it had obtained a new supply of water at a large expense, and praying permission to charge water rents in accordance with a schedule presented to the court. At the hearing upon this petition the company presented certain requests to the court, two of which and the answers thereto are as follows:

2. The schedule of new rates proposed by the water company and submitted to the court is reasonably just and fair, taking

into consideration the investment of the company, its necessary expenditures, and a reasonable sinking fund to be accumulated for payment of its debt or repair of its plant. *Answer:* That the schedule of rates made by the court is reasonably just and equitable, taking into consideration the actual investment of the company, its necessary expenditure and other circumstances proper for consideration surrounding the case, and the rates and charges as fixed in said schedule are fair and reasonable compensation for the water so furnished, and render it possible for the defendant company to furnish water without loss, or so low as to amount to a practical confiscation of the property invested in the business.

4. The Butler Water Company is a corporation for profit and, as such, is entitled to charge such rates for water as will pay expenses, accumulate a sufficient fund to maintain the plant in good condition, and pay a reasonable profit upon the money expended. So long as the rates charged, or proposed to be charged, do not exceed this, they are not extortionate or unjust, and are not within the control of the court. *Answer :* I cannot find conclusions of law as requested by the defendant company, and hold that the charges must be determined with reference to the expenditure in obtaining the supply and providing for the accumulation of a sufficient sinking fund to maintain the plant in good condition and pay a reasonable profit upon the money expended, and so long as the rates so charged do not exceed this, they are not excessive or unjust, and are not within the control of the court. We have no authority for such a ruling, and it would be unjust to the consumer, who would have to pay full cost of the water, provide a sinking fund, secure a reasonable profit upon the investment, and have no voice in the management of the business of the company. The act of assembly in this regard can bear no such construction. It is true this is an important element in the case, but not the controlling one. Other interests and surroundings must be carefully considered. The court in its judgment and discretion must have reference both to the expense necessary to furnish water and to what is a fair and reasonable compensation therefor, so as to render it possible to furnish water without loss, or so low as to amount to a practical confiscation of the property invested in the business.

GREER, P. J., filed the following opinion:

The plaintiffs in their bill allege in paragraph 7 that the said Butler Water Company did not furnish a sufficient supply of pure water for the use of the plaintiffs, citizens of the said borough, but on the contrary the supply of water as furnished by the said Butler Water Company had been insufficient, impure, filthy, and absolutely unfit for use for domestic and other purposes, and in paragraph 10, that the schedule of rates and charges of water rents assessed, charged and collected by the said Butler Water Company for the water furnished by it to the plaintiffs and the citizens of said borough who use the water so furnished, had been excessive, unfair, unjust, extortionate, oppressive, lacked uniformity, and were unequal, and made several prayers, two of which are as follows: (*a*) To hear, inquire and determine as to the impurity and deficiency of the water supply as furnished the plaintiffs and citizens of the said borough by the said company, and (*d*) to decree that the charges of the said water company assessed and charged to each of the said plaintiffs shall be decreased as to the said court may seem just and equitable.

After the greater part of the testimony had been taken before the judge the parties entered into an agreement in writing, filed in the case, by which the court was asked to hold its decision as to rates and charges until after a decision was had upon the question of the sufficiency of supply and purity of the water. This question having been decided by the court below and affirmed by the Supreme Court, the defendant company came in on March 9, 1896, representing that the water supply at that time was reasonably pure and sufficient in quantity to supply its patrons, and that the said company had remedied the defects complained of in the plaintiffs' bill, and asked that evidence be heard, and that the court fix the rates to be charged and collected by the defendant company, whereupon the court fixed March 26 as the time for further hearing upon the question of the present supply and condition of the water, and of rates and charges, at which time some additional testimony was taken, and the parties fully heard upon all the questions open for decision. The defendant company in its testimony shows that in the fall of 1895 it went up the Connoquenessing creek from thirty-three to thirty-five thousand feet to Boydstown, and built

an impounding dam, and laid a terra cotta water line from that point to its receiving well at Butler, at a cost of about $37,647; that their impounding dam covers in the neighborhood of forty-nine acres of land, and will contain over one hundred million gallons of water; that the watershed from which the water is received is generally from wood and grass land, and is likely to be pure and wholesome; that from every indication, and from an estimate of the rainfall, and extent of the watershed, and quality and character of the ground, the water obtained and impounded in this dam will be adequate to supply the citizens of Butler, and be reasonably pure and wholesome. The defendant company also called a number of witnesses, amongst whom were three physicians, who testified as to the present condition of the water. Dr. Graham says he has been using it about a month: "It is fairly good for domestic use; it is a little hard for washing purposes, but there is nothing in it to be injurious to persons drinking it; there may be a little salt water in it." The doctor says on cross-examination that his family also used rain water for domestic use during the last month. Dr. Hoover says he has been using the water for part of a month, two, three or four weeks, and that it is is reasonably pure and wholesome, and fit for domestic use; that it is hard, and that he has seen it discolored in the last month. Dr. Pillow says, "I think it is reasonably pure and fit for domestic use; I think it is good; I have been drinking it right along." He has not noticed any particular hardness lately. Porter W. Lowry says his family has been using the water for about a month, exclusively since the first of March, and that it is all right for domestic purposes, except that the folks at home complain that it is too hard to wash clothes with it, but are using it for laundry purposes. "I suppose the way it is this morning it would not do for washing clothes, would not be sufficiently clear to wash clothes." C. N. Boyd, a druggist, says he has been using it for about six weeks for domestic purposes at his home, and at his store for various purposes, except chemical purposes, for which he uses distilled water; he uses it in his soda fountain, and says it is fairly satisfactory, but does not use it for laundry purposes; has found no injurious effects, and has heard no complaints about its hardness. J. L. Purvis has been using it for domestic purposes, and supposes his family is using

it for laundry purposes; he considers it good; draws it from the spigot; uses it to wash with. " I noticed last night for a minute or two that there was a little discoloration." He is familiar with the improvements, and has no doubt as to the ample supply at all seasons of the year, and has no doubt of the capacity, permanency and success of the improvements lately made.

This proof, though not very positive, is not denied by the plaintiffs, and the court is justified in finding as a fact that the quantity of water now being furnished by the defendant company, and that which has been furnished since March 1, 1896, is adequate to supply the wants of its consumers, and the water is ordinarily and reasonably pure, and is fit to be used for domestic and other purposes.

The next question for consideration is the one as to rates and charges. The latter part of clause 7, in thirty-fourth section of the act of April 29, 1874, gives the court of common pleas jurisdiction and power upon a bill or petition of any citizen using water of any water company to hear, inquire and determine as to the charges for water so furnished, and to decree that the bill be dismissed or the charges decreased as to the said court may seem just and equitable.

This act—and I know of no other act of assembly regulating this question—gives no rule to govern the court in determining what are just and equitable rates. Neither have I found or been referred to a decision of the Supreme Court or any other court in the commonwealth furnishing a precedent to follow; therefore the duty of the court is a hard one. In localities where water is convenient, abundant and reasonably pure, as at Chicago, Cleveland and other cities upon lakes, and where very large amounts are daily used, it can be furnished at rates very much lower than where it is scarce, and where impounding dams must be built, and the water stored and conveyed through long lines of pipe, as must necessarily be done in many country districts; so that it would not be fair and just to have a uniform rate throughout the United States or throughout the state. Neither can the rates be established and fixed from the cost of the water plant, and the expense of running the same, as that would indirectly make the consumers insurers to stockholders in water companies that their investments are profitable.

Justice WILLIAMS, in his opinion in the case of Com. v. Russell, said: " The interests of the water company, and those of the public, though not identical, are clearly related. The furnishing of water to the public is like the furnishing of light and heat for domestic purposes, a 'public use.'" It receives its charter and power from the commonwealth, with its right of eminent domain, and with its exclusive right to furnish water to the consumers, upon the principle that the people have rights which must be respected. If it was the duty of the court to look after and protect the interest of the water company only, its labors in this matter would be but one of calculation; obtain the cost of the plant, the yearly expenses of running it, an estimate of the numbers of consumers and amount of water used annually, fix a rate of charges which would be sufficient to pay the expense, and a fair, reasonable, profitable dividend to the stockholders. In this way the people would pay for the repairs and betterments of their works, interest on their money, and a profit on their investment, also . pay for their mistakes, blunders and losses. This would indeed make the water business a sure, safe and profitable one, and one in which almost every person would be willing to invest money. It would be as safe as government bonds, and pay better than banking, and the company which would be first to get into a town would be pretty sure to remain there; but in justice and equity to the people this rule cannot be established, and we must look for another.

The defendant company has submitted a schedule of new rates, and asks the court to find as a fact that it is reasonable, just and fair, taking into consideration the investment of the company, its necessary expenditures and a reasonable sinking fund to be accumulated for payment of its debts or repair of its plant, and asks this finding on the ground that the amount of money originally invested in the works is $125,301.08, and the late improvements cost $40,000, making a total investment of $165,301.08. That the annual expense of operating, taking the average of the last four years, is $5,466.04, which added to interest on $170,000, money for sinking fund to pay debts and expense, runs their estimated annual current expenses up to $21,180.04. I have not been fully satisfied that this last estimate is correct, and will not take time to examine or explain.

Under authority of our equity rules, I called in the aid of an accountant, John Findley, an expert bookkeeper, who has made a careful examination of the books and papers of the defendant company, and has made a statement which has been filed in the case, showing 1,992 shares of stock issued, amounting to $99,600; 980 of these were for original cost of the plant, $49,000; 316 shares were sold and put into the plant, $15,800; 696 shares were divided among the stockholders pro rata, amounting to $34,800; dividends paid in stock, $37,400; dividends paid in cash, $41,066. Mr. Findley says: "Counting the time from November, 1883, two years before there were any dividends paid, and estimating the actual capital paid in by the stockholders, the amount of cash dividends paid would be at the rate of seven per cent on the capital invested for the whole time. If to the cash dividends we add the stock dividends, it will make the rate per cent on the investment about twelve and four fifths per cent. From November, 1889, to November, 1894, the last five years that cash dividends were paid, the rate on the actual investment is eight and one fourth per cent. If to cash dividends we add the stock dividends paid during the same period, it makes the rate 19 per cent on the investment." The dividends were paid semi-annually, and half the dividend at each payment. Of this $99,600 stock, $37,410.61 was stock dividends, making the actual investment by the stockholders $62,189.39, and the actual receipts, after deducting $40,993.40 of expenses, are $78,632.56, so that on an investment of $62,189.39 by stockholders they have from November, 1883, to November, 1894, about eleven years, over $41,000 in cash, and new stock amounting to $34,800, making in the eleven years over one hundred and twenty-two per cent profit on the original investment or eleven per cent per annum. Much the largest profits were made in the last five years, during which time I have no doubt they would reach the estimate fixed by Mr. Findley.

The first part of the seventh clause of the thirty-fourth section of the act of 1834 provides that at any time after twenty years from the introduction of water into any town, it may become the owner of the works and property of the company by paying the cost of erecting and maintaining the same, with interest thereon at the rate of ten per cent. per annum deducting from the interest all dividends theretofore paid. This of course

does not control the court in fixing the rates in this case, but it is a pretty good indication that the lawmakers, at the time this act was passed, though the ten per cent a fair profit to the water company, when it was getting the return of the full amount of the investment.

Mr. Meredith, the superintendent, sworn on part of the defendant company, says the daily consumption of water at Butler is from one million to one million five hundred thousand gallons. This in a year will amount to from three hundred and sixty-five millions to five hundred and forty-seven millions gallons. Let us be liberal with the estimate and allow for waste and bills not collected, and presume the company would be paid for two hundred million gallons in a year, at thirty cents per thousand gallons, and we have the company receiving $60,000 a year. I am unable to reconcile this statement with the receipts of the company for the last few years as shown by its testimony, but considering this statement as correct, also considering the receipts during the five years immediately before the commencement of this proceeding, and taking into consideration the amount of money invested originally in the works, etc., and since in improvements, betterments and repairs, and the annual cost of running the plant, and also considering the size, importance and future of Butler and the number of water consumers that may be reasonably expected if the charges for water are put at reasonable rates, and I am firmly of the opinion that the schedule submitted by the defendant company is too high, and refuse the second finding of fact as requested by the defendant company.

A new schedule is made fixing the rates for the plaintiffs in this case at what I deem just and equitable, and in making it no change is made upon the schedule submitted by the defendant company, except for domestic rates and meter rates. Should any consumer in the other classes feel that his rates are excessive he can easy remedy the evil by using a meter and paying for what he uses, but this rule for many reasons will not always apply to use for domestic purposes, therefore the change is made in this particular. Should the water company feel that these rates are too low it has the right to put on a meter and sell by it; the rates as fixed to apply to consumers, plaintiffs in this case, furnishing their own meter. Where the water com-

pany furnishes meters to patrons using ten thousand gallons or less per quarter then the rates shall be thirty-five cents per thousand gallons until the difference between thirty and thirty-five cents per thousand gallons amounts to the price of the meter and cost of placing it, when it shall become the property of the consumer, and the rates thereafter be thirty cents per thousand gallons. The water company may furnish meters for any of its consumers who do not have them of their own, and who refuse to put them on within thirty days after notice.

From the testimony submitted in this case I make the following

### FINDING OF FACTS.

1. The quantity of water now being furnished by the defendant company, and that has been furnished since March 1, 1896, is adequate to supply the wants of its consumers, and the water is ordinarily and reasonably pure and fit to be used for domestic and other purposes.

2. The schedule of rates made by the court is reasonably just and equitable, taking into consideration the actual investment of the company, its necessary expenditure and other circumstances proper for consideration surrounding the case; and the rates and charges as fixed in said schedule are fair and reasonable compensation for the water so furnished, and render it possible for the defendant company to furnish water without loss, or so low as to amount to a practical confiscation of the property invested in the business.

From a careful consideration of this case I have reached the following

### CONCLUSIONS OF LAW.

1. The court having found, as requested in the first paragraph of the defendant company for finding of facts, that the quantity of water now being furnished by the defendant company is sufficient, and is ordinarily and reasonably pure and fit for use, the order heretofore made enjoining the defendant company from the collection of rates must be rescinded, and the defendant company be allowed to charge for the water furnished since March 1, 1896, at such rates as are just and equitable.

2. The rate for water charged by other water companies, or water tax levied by municipalities, do not furnish a precedent to govern this court as to proper charges to be made by the

defendant company. Other rates or taxes may be too high or too low. The charge in any particular case must be governed by the particular facts in question especially controlling it.

3. It being found as a fact that the water furnished by the defendant company is adequate and reasonably pure, the power of the court ends with fixing the rates for water as it is furnished. The water company may for itself select the source of supply, and determine the system of collection and distribution, the mode of storage, and control generally the business details, and the rates must be determined with reference to the justice and equity of the case.

I cannot find conclusions of law as requested by the able solicitors of the defendant company, and hold that the charges must be determined with reference to the expenditure in obtaining the supply and providing for the accumulation of a sufficient sinking fund to maintain the plant in good condition, and pay a reasonable profit upon the money expended, and so long as the rates so charged do not exceed this, they are not excessive or unjust, and are not within the control of the court. We have no authority for such a ruling, and it would be unjust to the consumer who would have to pay full cost of the water, provide a sinking fund, secure a reasonable profit upon the investment, and have no voice in the management of the business of the company. The act of assembly in this regard can bear no such construction. It is true this is an important element in the case, but not the controlling one. Other interests and surroundings must be carefully considered. The court in its judgment and discretion must have reference both to the expense necessary to furnish water, and to what is a fair and reasonable compensation therefor, so as to render it possible to furnish water without loss, or so low as to amount to a practical confiscation of the property invested in the business. It seems fairest to fix a rate for the water by quantity, and ascertain this quantity by meter, so that the consumer may use as much as he desires and pay for the amount so used.

Estimating that 200,000,000 gallons are sold yearly (and this is much lower than the amount fixed by the testimony of the defendant company), one half of which at the lowest rate, ten cents per thousand gallons, and the other half at twenty cents per thousand gallons, the company would have an annual income

of $30,000, which would undoubtedly be a fair and reasonable compensation to it.

Some evidence has been offered to show charges for water at other places by meter, and I have taken the pains to receive some information outside the testimony from public records elsewhere, from which I find the rate per thousand gallons as follows.

| | |
|---|---|
| Etna, Pa. . . . . | From 8 to 30 cents |
| Greensburg, Pa. . . . . | From 8 to 25 cents |
| Philadelphia, Pa. . . . | From 4 |
| Brooklyn, N. Y. . . . | From 7½ to 11⅝ cents |
| St. Louis, Mo. . . . | From 10 to 30 cents |
| Richmond, Va. . . . . | From 7½ to 15 cents |
| Charleston, S. C. . . . | From 20 |
| Birmingham, Ala. . . . | From 8 to 30 cents |
| Williamsport, Pa. . . . | From 5 to 10 cents |
| McKeesport, Pa. . . . | From 4½ to 30 cents |
| Oil City, Pa. . . . . | From 6 to 25 cents |
| Washington, D. C. . . . | From 3 |
| New York . . . | 10 cents per hundred cubic feet |
| Chicago, Ill. . | 8 to 10 cents per hundred cubic feet |

Some few other places have rates higher than these, but not many.

These charges generally are very much lower than those fixed for the Butler company, but do not have a controlling influence in establishing its rates. Nevertheless they may rightfully be considered as an important element in settling the question.

The defendant company has not shown such facts and circumstances as would justify a court in fixing the rates and charges as suggested in its schedule submitted, nor to show why its rates should be so much in excess of the rates charged at the different places above mentioned.

The watershed of the streams supplying the defendant company with water covers over 18,000 acres of land, and the estimated yearly waterfall at the rate of 36 inches will produce over 19,500,000,000 gallons, or over 53,000,000 gallons daily, and supply 10,000 people with over 5,300 gallons each per day. The water supply of the Connoquenessing and its tributaries, with a rainfall of 32 inches per year, will furnish a sufficient supply of water for ten times the population of Butler.

With this abundant water supply, with the knowledge of the investment and past receipts and expenditures of the company, with the information of the charges of other cities and towns, with the prospect of the future growth of the town of Butler, and with the testimony of the defendant company, I feel confident that the court in justice and equity should not hesitate to decrease the present schedule of charges, as submitted by the company defendant, and fix the rates as in the schedule hereto attached and made part of this decision.

Therefore the court having found as a fact that the quantity of water now being furnished by the defendant company is sufficient to supply the wants and requirements of the patrons of the company and citizens of Butler, is ordinarily and reasonably pure and fit for use, the order heretofore made enjoining the defendant company from the collection of rates is rescinded, and the defendant company is allowed to charge for water furnished since March 1, 1896, and hereafter furnish according to the rates as established in the attached schedule. Also that the defendant company pay the costs in this case, including a fee of $35.00 to John Findley, accountant.

The court entered the following decree:

1. The quantity of the water now being furnished by the defendant company to its patrons, the plaintiffs in this case, is sufficient and is ordinarily and reasonably pure and fit for use.

2. The order heretofore made on September 14, 1895, in this case, that " from February 1, 1895, until pure (reasonably pure) water in sufficient quantity is furnished by the Butler Water Company to its patrons, no rates or charges shall be made or collected from consumers," except for certain purposes therein stated, is hereby rescinded, and the defendant company is permitted and allowed from March 1, 1896, and hereafter, to charge the plaintiffs at the rates hereinafter fixed by the court.

3. The water rates of the defendant company from March 1, 1896, to be charged to and collected from the plaintiffs for water furnished by the defendant company to the plaintiffs shall be as follows, viz:

DOMESTIC RATES FOR EACH YEAR.

A minimum rate of $4 will be charged for each family in dwellings. Additional charge for each furnished room, above one, without spigot therein . . . . . . . . $ 1 00

For each slop sink using hot and cold water or both—

| | |
|---|---:|
| Self-closing spigot . . . . . | 3 00 |
| Common spigot . . . . : . | 3 50 |
| Bath tub—Self-closing spigot . . . | 2 50 |
|    Common spigot ＼ . . . . | 3 00 |
| Wash basins, each—Self-closing spigot . . | 2 00 |
|    Common spigot . . . . | 2 50 |
| Water closets, each . . . . . | 3 00 |
| Wash pavement, street sprinkler and lawn sprinkler, up to 60 feet front, minimum . . . | 5 00 |
| Over 60 feet front, 4 cents per lineal foot . . | |
| Stationary wash tub . . . . . | 1 50 |
| Second tub . . . . . . . | 1 25 |
| Third tub or more, each . . . . | 1 00 |

All additional fixtures for use of water, special rates.

### STORES, OFFICES, ETC.

| | |
|---|---:|
| Wash stands, each . . . . . . | $ 5 00 |
| Water closets, each . . . . . . | 6 00. |
| Uses of water in store rooms or office . . | 5 00 |
| Sleeping rooms, each . . . . . . | 5 00 |
| Barber shops, each chair . . . . | 4 00 |
| Wash basins, each . . . . . . | 5 00 |
| Public bath, each tub . . . . . | 12 00 |
| Drug stores . . . . . . . | 10 00 |
| Soda fountain . . . . . . | 15 00 |
| Bakeries . . . . . . . . | 15 00 |
| Meat and fish markets . . . . . | 12 00 |
| Restaurants, in addition to house rates . . | 15 00 |
| Photograph galleries . . . . . | 15 00 |
| Billiard rooms . . . . . . . | 10 00 |
| Water closets in billard rooms . . . | 10 00 |
| Urinals in billiard rooms . . . . . | 5 00 |
| Wash stands in billiard rooms . . . | 5 00 |

### STABLES—LIVERY, HOTEL AND BOARDING STABLES.

| | |
|---|---:|
| Minimum . . . . . . . | $50 00 |
| Each stall above five . . . . . | 3 00 |
| Each wheeled vehicle above five . . . | 2 00 |
| Private stables, each stall . . . . | 2 00 |
| Each wheeled vehicle . . . . . | 2 00 |

#### HOTELS AND BOARDING HOUSES.

| | |
|---|---:|
| Rooms, house rates . . . . . | |
| Water closets, self-closing, each . . | $8 00 |
| Urinals, self-closing, each . . . . | 8 00 |
| Urinals, not self-closing, each . . . | 10 00 |
| Bath tubs, private rates . . . . | |
| Wash basins, each . . . . . | 6 00 |
| Bars with water fixtures . . . . | 30 00 |
| Bars without water fixtures . . . . | 15 00 |
| Hotel kitchens, hot and cold water attachments | 15 00 |

#### FOUNTAINS.

| | |
|---|---:|
| Flowing not to exceed ten hours per day . | $10 00 |

#### STEAM ENGINES.

| | |
|---|---:|
| Per horse power, ten hours per day . . | 2 00 |

#### SCHOOLS.

Public and private for average number of scholars in attendance, 5 cents each.

Wash basins, water closets and any additional use of water, special rates.

#### MOTORS.

| | |
|---|---:|
| Publishing one weekly newspaper and job work | $80 00 |
| Daily edition, additional . . . . | 50 00 |
| For ice cream freezers . . . . . | 40 00 |
| For fans in hotels, restaurants, etc., each . | 40 00 |
| For meat markets . . . . . . | 35 00 |
| For organs . . . . . . . | 20 00 |

#### PUBLIC BUILDINGS.

Special rates for building purposes,

| | |
|---|---:|
| For brick per M . . . . . | 12 cts. |
| For stone per perch . . . . . | 08 cts. |
| Plastering per 100 yards . . . . | 75 cts. |

#### METER RATES.

| | |
|---|---:|
| Yearly minimum rate . . . . . | $ 9 00 |
| Rate per 1,000 gallons per quarter, first 10,000 gallons or less . . . . . | 30 cts. |

Amount exceeding 10,000 gallons and under
    50,000 gallons  .    .    .    .    .    .    25 cts.

Amount exceeding 50,000 gallons and under
    250,000 gallons  .    .    .    .    .    18 cts.

Amount exceeding 250,000 gallons and under
    500,000 gallons  .    .    .    .    .    .    12 cts.

Amount exceeding 500,000 gallons and upwards    10 cts.

When the water is properly filtered the charges may be increased 20 per cent. [3]

IV. The costs in the case including a fee of $35.00 to John Findley, accountant shall be paid by the defendant company. [5]

*Errors assigned* were (1, 2) answers to requests as above, quoting them; (3) paragraph three of the decree; (4) paragraph four of the decree.

*T. C. Campbell* and *Charles H. McKee*, with them *John M. Thompson*, for appellant.—The orders of the court are based upon the mistaken theory of the court below that the corporation is absolutely under the control of the court, and that nothing is to be left to the business discretion of the board of directors, a mistake that was certainly corrected by this court in the report of the case in 172 Pa. 489, as to the question of obtaining a supply of water, but that is persisted in here as to the question of rates.

To fix the rates so that the mere running expenses shall be paid is a total confiscation of the plant; it is a taking of private property for public use without compensation. The property of the stockholders in a water plant is the right to profits after the running expenses have been paid; but to deny all profits is to wholly confiscate; to refuse reasonable profits is a partial confiscation: Stone v. Farmers' Loan Assn., 116 U. S. 307.

*Andrew G. Williams*, with him *Clarence Walker*, *W. A. Forquer*, *S. F. Bowser* and *R. P. Scott*, for appellees.—The rights of the company are fixed by the act of April 29, 1874, under which it came into existence, and so are its obligations. If as alleged it fails to furnish a sufficient supply of pure water the courts are open to any complaint: Metzger v. Borough of Beaver Falls, 178 Pa. 1; Brymer v. Butler Water Co., 172 Pa. 489.

OPINION BY MR. JUSTICE WILLIAMS, January 4, 1897 :

The questions presented on this appeal are unlike those that were considered and decided in 172 Pa. 489, when these parties were first before us. The questions then raised related to the power of the court to suspend the collection of water rents by the company so long as the water delivered by it to its customers was so impure as to be clearly unfit for domestic use. We held, affirming thereby the ruling of the court below, that the act of April 29, 1874, invested the courts of common pleas with the visitorial powers of the commonwealth as to water and gas companies, so far as related to the quality and quantity of the supply furnished and the prices charged therefor. This supervisory power was brought into exercise upon the petition of one or more consumers making complaint against the company on account of deficiency in the quantity or quality of the water furnished, or of the excessive and unreasonable charges made therefor. Upon a hearing of the testimony the statute empowered the court to dismiss the petition, or to make such order for the relief of the petitioners as the facts disclosed by the evidence might require. This we held included the power to enjoin the company against the collection of water rents when the water furnished was clearly unfit for domestic use. But we also held that this statute gave the court no power to operate the plant of the water company, or to interfere with or direct the official discretion of its officers otherwise than as therein prescribed. Where it should go for its source of supply, by what route the supply should be brought to its distributing reservoir, and by what system of distribution it should be taken to its customers, together with all similar questions of construction and operation, were within the exclusive control of the company. It might determine to suspend its operations or to continue them, to increase its capital or to withdraw it altogether, but so long as it continued in the exercise of its franchises it was subject to the supervisory control of the court for the protection of the public supplied by it. The court was charged to inquire first, whether the corporation was discharging the duty it had assumed, and was supplying water to its customers suitable in quality, and sufficient in quantity. It was also to inquire upon complaint made whether the company was extorting from its customers an unreasonable price for the water furnished. While the liti-

gation in which this decision was reached was in progress the water company had been earnestly at work, endeavoring to relieve itself from its embarrassment. It had gone up the Conoquenessing creek several miles to a point above the oil and gas wells which had poured salt water into the stream, constructed a large impounding reservoir, extended their supply pipes up to it, and thus obtained a supply of water reasonably pure, and ample in quantity, to supply the town of Butler. When this had been accomplished the water company presented in the court below its petition setting forth the facts and asking that their truth be inquired into, and if satisfied, that the court would so determine by an appropriate decree, and permit the company to collect water rents from its customers in accordance with a schedule which it had prepared and presented to the court. The learned judge directed an investigation. From the evidence produced on the hearing he found the facts to be as alleged by the water company, and that the company was now entitled to charge and collect water rents, but he declined to approve the schedule of water rents presented. On the other hand he prepared another schedule made up in part from evidence received upon the hearing, and in part from information gathered through other channels, regarding the prices charged in other cities and towns. This schedule he incorporated into the decree, and the company was authorized thereby to charge water rents in accordance with the rates so fixed and not otherwise. This appeal is from so much of the decree as imposes the schedule of charges prepared by the learned judge upon the water company, and forbids the charging and collection of any other rates than those so prescribed. The water company alleges that the court has no power to adopt a tariff of prices for it; but that if this proposition should be denied, still the tariff of prices adopted by the court is erroneous because constructed upon a mistaken basis. It will thus be seen that the real question at issue is whether the boundary line that separates the discretionary control of the owner from the supervising control of the courts, which was pointed out in 172 Pa. 489, terminates when the plant is completed and a suitable water supply procured, or continues on through the business operations of the corporation? The answer to this question must depend on the nature and extent of the powers that result

from the mere fact of ownership, and on the character of the restrictions, if any, which the commonwealth may have put upon those powers in the interest of the public. The ownership of a corporation is as absolute and comprehensive as that of a private citizen. It includes the right to put a value upon its property, and to determine on what terms it will part with it, or supply its customers with the commodity in which it deals, in the same manner that an individual or a partnership could do. But as the corporation derives its existence and its powers and franchises from the state, it is more directly accountable to the state than a natural person now is, under existing laws, for the exercise of good faith in the conduct of its business and for the reasonableness of its charges. The state intervenes for the protection of the citizen. When therefore a customer of a water company finds the company neglecting or refusing to furnish him with an adequate supply of water, or finds the water furnished to be unfit for domestic use, he is authorized by the act of 1874 to make his complaint to the court of common pleas of the proper county by petition. The court is thereupon required to investigate the subject and " to dismiss the complaint, or compel the corporation to correct the evil complained of " as the evidence may require. As one of the proper methods for the enforcement of a decree against the company, we held in Brymer v. Butler Water Co., 172 Pa. 489, that the company might be restrained from the collection of water rents until the decree was complied with. But the same statute provides that any customer of the company may complain by petition of the charges made for water furnished, and requires the court to hear and determine as to the charges complained of, and " to decree that the said bill be dismissed, or that the charges shall be decreased, as to the said court shall seem just and equitable."

A provision in the third section of the act of June 2, 1887, relating to the jurisdiction of the courts over gas and water companies is supplemental to the act of 1874, and defines somewhat more distinctly the duty of such companies to furnish the public with pure gas and water, but it contains no allusion to the subject of price. The power of the court to interfere between the seller and the buyer of water is conferred only by the provisions already quoted from the act of 1874; and that act authorizes

the court to entertain the complaint of the buyer, to investigate the reasonableness of the price charged, and to " dismiss the complaint," or to order that the charges complained of, if found to be unreasonable and unjust, " shall be decreased." The water company prepares its schedule of prices in the first instance, and makes its own terms with its customers ; but if these are oppressive, so that in the exercise of the visitorial power of the state the just protection of the citizen requires that they be reduced, then the court is authorized to say " this charge is oppressive. You must decrease it. You are entitled to charge a price that will yield a fair compensation to you, but you must not be extortionate." This is not an authority to manage the affairs of the company, but to restain illegal and oppressive conduct on its part in its dealings with the public. It may be that the power to order that any particular item of charge shall " be decreased " includes the power to fix the extent of the reduction that must be made, or to name the maximum charge for the particular service in controversy, which the court will approve, but the decree is that the item shall " be decreased " either generally or to a sum named. The schedule of charges must be revised accordingly by the company defendant, and such revision may be compelled in the same manner that the decree of the same court may be enforced in other cases.

We do not think this supervisory power would justify the court in preparing a tariff of water rents and commanding a corporation to furnish water to the public at the rates so fixed. This would involve a transfer of the management of the property, and the business of a solvent corporation, from its owners to a court of equity, for no other reason than that the court regarded some one or more of the charges made by the company as too high. The act of 1874 contemplates no such radical departure from established rules as this, but provides simply for the protection of the citizen from extortionate charges specifically pointed out and complained of by petition. This leads us to the second question raised, viz : by what rule is the court to determine what is reasonable, and what is oppressive ? Ordinarily that is a reasonable charge or system of charges which yields a fair return upon the investment. Fixed charges and the costs of maintenance and operation must first be provided for, then the interests of the owners of the property are to be

considered. They are entitled to a rate of return, if their property will earn it, not less than the legal rate of interest; and a system of charges that yields no more income than is fairly required to maintain the plant, pay fixed charges and operating expenses, provide a suitable sinking fund for the payment of debts, and pay a fair profit to the owners of the property, cannot be said to be unreasonable. In determining the amount of the investment by the stockholders it can make no difference that money earned by the corporation, and in a position to be distributed by a dividend among its stockholders, was used to pay for improvements and stock issued in lieu of cash to the stockholders. It is not necessary that the money should first be paid to the stockholder and then returned by him in payment for new stock issued to him. The net earnings, in equity, belonged to him, and stock issued to him in lieu of the money so used that belonged to him was issued for value, and represents an actual investment by the holder. If the company makes an increase of stock that is fictitious, and represents no value added to the property of the corporation, such stock is rather in the nature of additional income than of additional investment. This whole subject was brought to the attention of the learned judge by a request that he should find as matter of law that the reasonableness of the charges must be determined with reference to the expenditure in obtaining the supply, and providing for a fund to maintain the plant in good order, and pay a fair profit upon the money invested by the owners, and that a rate which did no more than this was neither excessive nor unjust. This the learned judge refused to find, saying in reply to the request, " we have no authority for such a ruling, and it would be unjust to the consumer who would have to pay full cost of the water, provide a sinking fund, secure a reasonable profit upon the investment, and have no voice in the management of the business of the company. The act of assembly in this regard can bear no such construction."

This ruling cannot be sustained. The cost of the water to the company includes a fair return to the persons who furnished the capital for the construction of the plant, in addition to an allowance annually of a sum sufficient to keep the plant in good repair and to pay any fixed charges and operating expenses. A rate of water rents that enables the company to real-

ize no more than this is reasonable and just. Some towns are so situated as to make the procurement of an ample supply of water comparatively inexpensive. Some are so situated as to make the work both difficult and expensive. What would be an extortionate charge in the first case might be the very least at which the water could be afforded in the other. The law was correctly stated in the defendant's request, and the court was in error in refusing it. But we think the court had no power to adopt for, and enjoin upon, the company a comprehensive schedule like that incorporated into the decree in this case. The decree found that the water supply furnished by the defendant company was abundant and "reasonably pure and fit for public use," but, without any adjudication that any particular charge or charges complained of were excessive and must be decreased, he made a decree that "the water rates of the defendant company from March 1, 1896, to be charged and collected from the plaintiffs for water by the defendant company to the plaintiffs shall be as follows : " Then follows a table filling two and a half pages of the appellant's paper-book, and pro providing specifically for domestic rates, for livery, hotel and trading stables, for hotels and boarding houses, for fountains, steam engines, schools, motors, public buildings, special rates, and meter rates, subject to provision that "when the water" which the same decree had just pronounced to be reasonably, pure and suitable for domestic use "is properly filtered the charges may be increased twenty per cent." The school district of Butler was not a party complainant in this case, nor was the county of Butler, but both were taken under the protection of the court and specifically provided for by the decree. Fountains are luxuries. The question whether the police power of the state can be successfully invoked to cheapen the price of water furnished for purposes of display or the mere gratification of one's taste, is at least open to discussion, but, without discussion, it is disposed of by this decree, and the price reduced. In short, upon a general complaint that the rates charged by the defendant were too high, without specification of the particular charges that were alleged to be excessive, the court has undertaken to revise the entire schedule of prices, and instead of directing the company to decrease the objectionable charges, has formulated an entirely new schedule of prices, covering all of the business

of the company. This new schedule it has framed upon the mistaken basis adopted and stated in the third conclusion of law already considered. This action is not authorized by the act of 1874. It is not the hearing of a complaint against the charges made by the company and a decision of the controversy so arising, but it is the assumption of a power to frame a schedule of prices covering the entire business of the company, with all its customers, many of whom are not even complaining of the rates paid by them. The framing of such a general schedule is ordinarily the right of the company. The correction of this schedule when framed, whenever it may work injustice and hardship is the prerogative of the court, and one which should be fearlessly exercised.

For the reasons now given this decree cannot be affirmed, but under the peculiar circumstances surrounding this case we cannot enter a simple decree of reversal.

The first paragraph of the decree appealed from is affirmed. The second paragraph is affirmed so far as it operates to rescind the decree of Sept. 14, 1895. The third paragraph is reversed. The reversal to take effect on the first day of March, 1897. In the meantime the rates established by it shall continue. Before the first of March, 1897, the company may prepare a just and reasonable schedule of charges to go into operation on the said first day of March. If any of such charges shall be complained of thereafter the customer complaining may proceed under the act of 1874 to a hearing, and the court may dismiss the petition or order the charges to be decreased to such extent as may seem to the said court equitable and just. In view of the history of this case the fourth paragraph of the decree appealed from is affirmed.