# Pennsylvania Railroad Company *v.* Philadelphia County, Appellant.

*Constitutional law—Railroads—Common carriers—Regulation of rates—Acts of April 13, 1846, P. L. 312, April 13, 1846, P. L. 326, and April 5, 1907, P. L. 59—Confiscation.*

While the legislature is permitted to alter or revoke the charter of a corporation, it is prohibited from doing so in such manner that injustice will be done to the corporators. Whether the legislature has attempted to enact a measure prohibited by the constitution is for the courts; whether injustice has been done in any particular case is inherently and necessarily a judicial question.

The findings of fact of the court below that the Act of April 5, 1907, P. L. 59, in its operation reduced the returns to the shareholders of the Pennsylvania Railroad Company from their property to such an extent as to render the property unremunerative, will not be reviewed by the appellate court, unless shown to be clearly erroneous. In such a case the finding cannot be attacked because the court below confined its inquiry to the passenger traffic instead of taking into consideration the entire traffic of every kind.

Even so-called public service corporations are private property organized and conducted for private corporate profit and are entitled to make a fair profit on every branch of their business, subject to the limitation that their corporate duties must be performed even at a loss.

Public service corporations in Pennsylvania are entitled to look for a rate of return, if their property will earn it, not less than the legal rate of interest, and a system of charges that yields no more income than is fairly requisite to maintain the plant, pay fixed charges and operating expenses, provide a suitable sinking fund for the payment of debts and pay a fair profit to the owners of the property, cannot be said to be unreasonable.

In the operation of an unreasonable statute regulating the rates of railroad companies, the point of injustice may be reached long before that of confiscation, and to make the word "confiscatory" really appropriate to such statute, the word must be read, not in the sense of producing actual confiscation, but of having an inevitable tendency thereto.

MESTREZAT, POTTER and STEWART, JJ., dissent.

Argued Nov. 11, 1907. Appeal No. 346, Jan. T., 1907, by defendant, from decree of C. P. No. 4, Phila. Co., March T.,

1907, No. 5,312, on bill in equity in case of The Pennsylvania Railroad Company v. Philadelphia County. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Bill in equity for an injunction to restrain the county of Philadelphia from the collection of any penalty imposed by the act of April 5, 1907, for failure to comply with its provisions.

The court below filed an opinion which was in part as follows:

The evidence before the court establishes the following facts material to the decision of the question whether the act of April 5, 1907, is a reasonable regulation of passenger fares so far as concerns the Pennsylvania Railroad Company.

*a.* For the first quarter of the year 1907 the plaintiff's receipts from passenger traffic between points within this state (i. e., exclusive of interstate traffic) were $3,070,935.55.

*b.* Of these receipts the sum of $1,084,982.37 came from the sale of excursion tickets at the average price of 2.406 cents per mile. The sum of $595,997.31 came from the sale of excursion tickets at the average price of 2.109 cents per mile; $399,254.60 from commutation tickets at 1.46 cents per mile, and $990,701.27 from mileage tickets at two cents per mile.

*c.* As nearly as can be ascertained through a careful application of a rule of apportionment approved by railroad experts and in actual use by most of the large railroads of the country, the approximate cost to the plaintiff of handling its intrastate passenger business during the first three months of the present year was $2,921,607.91.

*d.* In the year 1906 the proportion borne by the receipts from intrastate passenger traffic for the first quarter to the total of such receipts for the whole year was 20.8 per cent. The proportion of the expenses connected with that branch of the plaintiff's business for the first quarter of the year to the year's total expenditure was 24.7 per cent. These proportions are practically (in each case) the same as the average for the previous ten years. Hence they may be fairly taken as the basis of a calculation of the probable receipts, expenditures and profits of the plaintiff on its intrastate passenger business for the year 1907 at the rates at present established.

*e.* Calculated upon this basis, the receipts on this class of business for 1907 will probably be $14,764,113.22, and the operating expenses will probably be $11,828,372.11. The amount of taxes apportionable to the plaintiff's intrastate passenger business under the usual and reasonable rule will probably be $380,350.86. The deduction of this sum from the amount of the difference between probable receipts from this business for 1907 and its probably cost as ascertained above leaves as the probable surplus of receipts over all expenditures the sum of $2,555,390.25 net.

*f.* Since most of the facilities employed by the plaintiff in handling its freight business are used in carrying on its passenger traffic, and as the same tracks, stations, etc., are employed for the handling of the intrastate passenger traffic that are used in its intrastate passenger business, the amount of the Pennsylvania Railroad Company's investment in the business last mentioned can be approximated only by apportionment. Under a rule of apportionment reasonable in itself and in general use for such purposes, the plaintiff's books show an investment in property required to conduct this branch of its business amounting to $53,600,598.74, of which $21,051,795.96 represents mortgage or otherwise funded indebtedness, giving rise to a yearly interest charge of $894,701.33. The sum of $32,548,802.78, therefore, approximately represents the amount of money contributed by the plaintiff's stockholders, plus the amount set aside from surplus earnings in past years, actually invested in the intrastate passenger business. It is to be noted that the par value of the shares and bonds of this corporation includes nothing but the sum which it actually received of them in cash.

*g.* Upon the actual investment of $32,548,802.78 of its own money, the plaintiff's probable earnings for 1907 from the intrastate passenger business, viz.: $2,555,780.82 less the year's probable taxes, would yield a return of 5.1 per cent, on the basis of the rates charged at present.

*h.* The business of carrying suburban passengers is remunerative to the Pennsylvania Railroad Company, even at the low rate at which commutation tickets are sold them, because the cost of such business in proportion to the number of passengers carried is much less than the cost of the ordinary passen-

ger traffic, and because the carrying of commuters produces incidentally much business at higher rates of fare. It is improbable that the doing away with commutation tickets and the exaction of a two cents per mile fare from those who have been using such tickets, would serve to increase the net profits of the plaintiff, since, in all likelihood, such a change would so reduce the number of suburban riders and the amount of higher rate business that such passengers incidentally bring to the company as to practically offset the increase of receipts due to the increase of fare.

*i.* The bases of several of the calculations above referred to are deduced from the experience of the Pennsylvania Railroad Company during the past few years. During that time the amount of business done has been very great. Should it fall off, as is not an unlikely occurrence, the expense of operating the plaintiff's railroad would not decrease in the same ratio in which its receipts would diminish. Moreover, the cost of operating the road shows a marked tendency to increase through the general increase of wages and the price of materials.

*j.* Assuming that no change is made in the price of commutation tickets and that all other fares in excess of two cents per mile are reduced to that rate, the profits of the plaintiff for 1907 upon its intrastate passenger business, calculated upon the same bases that are employed in the calculations above, would probably be reduced to $1,527,406.25, which after payment of interest charges would be a return of but 1.94 per cent upon the company's investment of $32,548,802.78.

Upon these facts we are asked by the plaintiff to declare that the regulation of passenger fares attempted by the act of April 5, 1907, is unreasonable. To this there is advanced on behalf of the defendant the particular objection that no evidence has been presented to show the results of the plaintiff's freight business; that its intrastate passenger business is so combined with its intrastate freight business as to be indistinguishable in their joint result; that greater profits on the one kind of traffic may make up for the lowering of profits on the other, and that, therefore, before it can be said that the act under consideration regulates the plaintiff's business unreasonably, the whole of that business must be considered, freight

traffic with passenger traffic.   This objection we think is over-
come by the following considerations :

1. Men who understand the railroad business thoroughly
and on whose opinion in relation to the subject we may with
confidence rely, declare that intrastate passenger traffic may
readily be distinguished from the rest of the plaintiff's busi-
ness by the application of certain rules developed by experi-
ence and · approved by general use ; second, the legislature
itself, in the very act now under discussion has, for purposes
of regulation, attempted to segregate the passenger traffic of
the railways and to deal with it as if it existed as a thing
apart from all else ; third, if pushed to its logical result the
argument advanced would justify a law requiring that the
railroad companies of the state should ·carry all intrastate
passengers without charge and look to their freight business
for reimbursement of expenses, and for a return on their in-
vestment in the business, which, of course, is the reductio ad
absurdum.

It is further and more generally objected by the defendant
that the plaintiff invites the court in this case to leave the
domain of fact, where it has to guide it, the testimony of
witnesses who have seen the things that they describe and
to enter the realm of speculation where all evidence is mere
guesswork, and where probability is the nearest approach to
reality and truth that can be found.   This objection seems
at first sight·more formidable than it really is.   Antithesis
always arrests attention.   In an inquiry, however, as to con-
ditions resulting from the operation of a regulation not yet
in force, nothing but probabilities can be expected.   Such a
situation is not one with which the law is unfamiliar.   It has
never required mathematical proof of the facts with which it
deals.   Most verdicts rest on the likelihood (not the certainty
by any means) that witnesses will tell the truth under oath.
Nevertheless, judgments are entered solemnly on such ver-
dicts.   And this is in accordance with the common practice
of mankind in the affairs of daily life.   No plan for future
conduct was ever formed that was not based upon the proba-
bility as to what circumstances would develop at the time for
its performance.   There is nothing more uncertain than human
life, but the study of the probabilities of its duration has made

the insurance of lives a safe and profitable business. It may well be doubted that the business of life insurance has received more careful attention than has been applied by intelligent students to the traffic of the country's railways. To such experts what seems to others mere chance and guesswork becomes reliable forecast. In our opinion, the approximations and probabilities worked out upon a broad foundation of established facts by men of experience and sound judgment, testifying under oath, may properly be considered a safe ground on which to base judicial action. Having such testimony before us we feel justified in accepting and acting upon the probabilities which it establishes.

Our conclusions upon the facts above outlined are:

1. Under the rule laid down by the Supreme Court of Pennsylvania in Brymer v. Butler Water Company, 179 Pa. 231, the schedule of rates under which the plaintiff now conducts its intrastate passenger business is not unreasonable, since the return produced does not yield the "legal interest on the investment" to which, as was said in that case, the investor in a public service business is entitled.

2. Since the reduction to the rate of two cents per mile fixed by the act of April 5, 1907, of all fares now established on a higher basis, would probably have the effect of reducing the profits of the plaintiff from its intrastate passenger business to a sum equivalent to less than two per cent on its investment in the facilities necessary for carrying that business on; and since a return so small is not fair remuneration for the use and risk of its property, Brymer v. Butler Water Co., 179 Pa. 231, the regulation attempted by the legislature in that act must, so far as it relates to the plaintiff and for so long as the present conditions continue, be adjudged to be unreasonable.

There remains now to be disposed of the question whether the act of April 5, 1907, is to be denied enforcement on the ground that by reason of the generality of its language it extends to interstate commerce and thus infringes on the province of the federal law. This question must be answered in the negative. It is, of course, not to be disputed that when, under its constitutional power to regulate commerce among the states, congress has undertaken the regulation of interstate

railroad rates, the legislature of Pennsylvania has no authority to meddle with that matter. But a legislative intent to exceed constitutional rights and to violate fundamental law is never to be presumed, if the language of the statute can be satisfied by a contrary construction. Interpretatio fienda est ut res magis valeat.quam pereat. A statute is to be construed in connection with a constitutional provision in pari materia. The act with which we are concerned is, therefore, to be regarded as intended to apply only to that part of the passenger business of the railroads over which the legislative power of regulation extends, and since that business is not so confused with interstate passenger traffic as to be insusceptible of separate regulation, we hold that the act is not invalid for the reason last suggested.

Upon the whole case we are of opinion, and, therefore, find that, although with respect to its title and other matters of form no valid objection to the act of April 5, 1907, exists, its operation, so far as it relates to the Pennsylvania Railroad Company, is objectionable on constitutional grounds for the following reasons :

1. As a regulation by the legislature of the rates of fare for passengers on the lines constructed by the plaintiff under the act of April 13, 1846, between Harrisburg and Pittsburg and between Pittsburg and Erie, the act violates an existing contract between the plaintiff and the commonwealth, and so contravenes article I, sec. 10, of the constitution of the United States.

2. As a regulation of the plaintiff's intrastate passenger business in its entirety the act, under existing circumstances, is unreasonable and confiscatory, and, by depriving the plaintiff of its property without due process of law, violates amendment XIV of the constitution of the United States.

3. Since.the taking from the plaintiff of the profitable use of its property invested in the intrastate passenger business may be regarded as a taking quoad hoc of that property for public purposes, and, since no just compensation is made therefor, the act violates article I, sec. 10, of the constitution of Pennsylvania.

4. Viewed as an alteration or revocation of the plaintiff's franchise to establish and enforce over the lines of road that

are now operated by it, and that have been leased or otherwise acquired by it since May 3, 1855, such rates as, within the maxima fixed by the second proviso of sec. 21 of the act of April 13, 1846, its president and directors may deem reasonable, the act of April 5, 1907, violates article XVI, sec. 10, of the constitution of Pennsylvania, because it does injustice to the corporators of the Pennsylvania Railroad Company by establishing so low a maximum rate of fare for the carriage of passengers as to render that branch of the plaintiff's business unremunerative, but providing no compensation for the loss thereby occasioned.

We accordingly adjudge that the act of April 5, 1907, cannot be enforced so far as concerns the Pennsylvania Railroad Company, and that the county of Philadelphia should be restrained from demanding fines and attempting by action to collect them, if the maximum rate which that act attempts to establish be disregarded by the plaintiff.

*Error assigned* was decree entered in accordance with the terms of the opinion.

*J. Howard Gendell,* city solicitor, and *M. Hampton Todd,* attorney general, with them *Andrew W. Crawford* and *Ernest Lowengrund,* assistant city solicitors, for appellant.—The legislature has the right to regulate the charges of railroad companies : Sharpless v. Mayor of Philadelphia, 21 Pa. 147 ; Atlantic Coast Line R. R. Co. v. North Carolina Corporation Commission, 206 U. S. 1 ; Ruggles v. Illinois, 108 U. S. 526, 536 ; Illinois Central R. R. Co. v. Illinois, 108 U. S. 541 ; Stone v. Ill. Cent. R. R. Co., 116 U. S. 347 ; Stone v. R. R. Co., 116 U. S. 352 ; Dow v. Beidelman, 125 U. S. 680 ; Charlotte, etc., R. R. Co. v. Gibbes, 142 U. S. 386 ; Chicago, etc., Ry. Co. v. Wellman, 143 U. S. 339 ; Pearsall v. Ry. Co., 161 U. S. 646.

The presumption in favor of the rate specified is very strong. The company must clearly show that it is so unjust as to be " confiscatory : " Chesapeake & Potomac Tel. Co. v. Manning, 186 U. S. 238 ; Minneapolis & St. Louis R. R. Co. v. Minnesota, 186 U. S. 257 ; Chicago, etc., Ry. Co. v. Tompkins, 176 U. S. 167 ; Lake Shore, etc., Ry. Co. v. Smith, 173 U. S. 684 ;

San Diego Land & Town Co. v. Jasper, 189 U. S. 439 ; Atlantic Coast Line R. R. Co. v. N. C. Corp. Commission, 206 U. S. 1 ; Steenerson v. Great Northern Ry. Co., 69 Minnesota, 353 ; State v. A. C. L. R. R. Co., 37 So. Repr. 657.

In determining whether a rate is reasonable the entire traffic of every kind must be taken into consideration. We cannot confine ourselves to passenger traffic alone, but must include the receipts from freight, expressage, packages and all other sources : Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U. S. 339 ; Missouri Pac. Ry. Co. v. Smith, 60 Arkansas, 221 ; Atlantic Coast Line R. R. Co. v. North Carolina Corporation Commission, 206 U. S. 1 ; Com. v. Covington, etc., Bridge Co., 14 Ky. L. R. 836 ; St. Louis & San Francisco Ry. Co. v. Gill, 156 U. S. 649 ; M. & St. L. R. Co. v. Minnesota, 186 U. S. 257 ; Covington, etc., Turnpike Road Co. v. Sandford, 164 U. S. 578 ; Brabham v. A. C. L. R. R. Co., 11 Interstate Commerce Rep. 464 ; Artz v. Seaboard Air Line Ry. Co., 11 Interstate Commerce Rep. 458 ; Chicago, Milwaukee & St. Paul Ry. Co. v. Smith, 110 Fed. Repr. 473 ; Matthews v. Board of Corp. Commissioners, 106 Fed. Repr. 7 ; Railroad Commission Cases, 116 U. S. 307 ; Savannah Bureau v. C. & S. Ry. Co., 7 Interstate Commerce Rep. 901, 608, 609.

Plaintiff has not proved that the rate named in the statute is too low—much less that it is confiscatory.

Even if the plaintiff were entitled to segregate its passenger business, and if it could separate the capital incident thereto, and if the future business, expenses and profits could be foretold accurately, it does not follow that it is necessarily entitled to six per cent thereon, for several reasons.

The company is not the only one to be considered. The reasonable rights of the traveling public must be protected : Covington & Lexington Turnpike Co. v. Sandford, 164 U. S. 578 ; Dow v. Beidelman, 125 U. S. 680 ; Steenerson v. Ry. Co., 69 Minn. 353 ; Matthews v. Board of Corp. Commrs., 106 Fed. Repr. 7 ; Chicago, etc., Ry. Co. v. Tompkins, 176 U. S. 167.

The plaintiff's charter does not give it immunity from regulation of rates by the legislature.

It is seriously questionable whether the power to regulate charges, which is one of the police powers of the state, can be

bartered away by the legislature at all. The general principle certainly is that all governmental powers are held by the government as a trustee for the people: Butchers' Union Slaughter House Co. v. Crescent City Live Stock Landing Co., 111 U. S. 746; Mott v. Penna. R. R. Co., 30 Pa. 9.

The plaintiff having "formally accepted the new constitution by a vote, duly passed, of its directors and stockholders, as referred to in the answer" by writing filed on March 8, 1901, formally accepting "all its provisions and particularly the provisions of the 16th and 17th articles thereof" the legislature has the "power to alter, revoke or annul" the charter, " whenever in their opinion it may be injurious to the citizens of this Commonwealth:" McNeill's Election, 111 Pa. 235; Tyrone Gas & Water Co. v. Tyrone Borough, 195 Pa. 566.

The charter was revocable at the time of the adoption of the present constitution: Com. v. Flannery, 203 Pa. 28.

Under art. XVI, section 3, relating to the police power, the legislature may regulate rates, even if it has not gained general control of plaintiff's charter.

The act of 1907 is a proper exercise of the reserved power of the legislature and does no injustice to the corporators: Wagner Free Institute v. Philadelphia, 132 Pa. 612; Com. v. Beneficial Asso., 10 Phila. 554; Gas Co. v. Mitchell, 1 Dauphin County Rep. 71; Zimmerman v. Perkiomen, etc., Turnpike Co., 81* Pa. 96; Peik v. Chicago, etc., Ry. Co., 94 U. S. 164.

*John G. Johnson*, with him *Francis I. Gowen*, for appellee. —By the terms of its charter appellee was vested with the right and power to itself determine what should be a reasonable rate to be charged for the transportation of passengers, and as the legislature reserved to itself no right either to control or interfere with such determination or to revoke or annul the grant itself, the right and power thus devolved upon and vested in appellee must be regarded and treated as secured to it by a contract with the state which the latter is powerless to revoke or impair: Philadelphia & Lancaster Turnpike Co. v. Gartland, 6 Phila. 128; Hartman v. Bechtel, 1 Woodward's Decisions, 32; Stanislaus County v. Canal & Irrigation Co., 192 U. S. 201; Georgia Banking Co. v. Smith,

128 U. S. 174; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362; Chicago, etc., R. R. Co. v. Iowa, 94 U. S. 155; Shields v. Ohio, 95 U. S. 319; City of Cleveland v. Cleveland City Ry. Co., 194 U. S. 517.

Nothing has transpired since the grant was thus made to appellee through and by its charter which has had the effect of converting such grant into one revocable at the will of the legislature or subject to alteration or amendment at its instance: Gloninger v. R. R. Co., 139 Pa. 13; Penna. R. R. Co. v. Miller, 132 U. S. 75; Com. v. Canal Co., 66 Pa. 41.

Even upon the assumption that the legislature has power to amend the charter of the appellee the act in question was not a valid exercise of such power, because:

*a.* Its passage was not warranted by the existence of a condition "injurious to the citizens of the commonwealth," a prerequisite to the exercise by the legislature of the power of amendment.

*b.* Its enforcement would do injustice to the corporators and stockholders of the appellee and, therefore, its enactment violated the restriction imposed by the constitution that in the exercise of the power of amendment no injustice should be done to stockholders: Com. v. R. R. Co., 58 Pa. 26; Wagner Free Institute v. Philadelphia, 132 Pa. 612; Hays v. Com., 82 Pa. 518; Cotting v. Kansas City Stock Yards Co., 183 U. S. 79; Louisville, etc., R. R. Co. v. McChord, 103 Fed. Repr. 216.

The enforcement of the act would so diminish the appellee's receipts from its passenger traffic within the state of Pennsylvania as to make that business noncompensatory, thus leading to both a deprivation of its property without due process of law, and a denial to it of the equal protection of the laws: Smyth v. Ames, 169 U. S. 466.

The act, by its terms, extends to, and includes, all passenger traffic on any railroad within the commonwealth; as well that which crosses the state line as that which begins and ends with the state and because it thus attempts to regulate interstate commerce, it is invalid and ineffective.

OPINION BY MR. CHIEF JUSTICE MITCHELL, January 20, 1908:

It may be conceded that the legislature has a power of supervision over corporations exercising quasi public functions,

which in general includes the right to regulate the rates and charges of railroads as common carriers. The principles on which the right is based as well as its extent and limitations have, however, been very broadly assumed, and in many of the recent cases without adequate consideration of the exceptional nature of this legislative power exercised in derogation of the fundamental principle that the management of property belongs to its owner. But it is not necessary to discuss this point. Attention has been called to it merely that the reasoning and conclusions of some of the more recent decisions may not be accepted without due consideration.

The Pennsylvania Railroad was chartered by the Act of April 13, 1846, P. L. 312, to construct and operate a railroad between what was then the borough—and is now the city—of Harrisburg and the city of Pittsburg. By section 21 of this act it is empowered, inter alia, from time to time to establish " such rates of toll or other compensation for the use of the said road and of said motive power and for the conveyance of passengers . . . . as to the president and directors shall seem reasonable; provided, however, nevertheless, that . . . . in the transportation of passengers no charge shall be made to exceed three cents per mile for through passengers, and three and a half cents per mile for way passengers."

By the Act of April 5, 1907, P. L. 59, entitled " An act to regulate the maximum rate and minimum fare to be charged for transportation of passengers by railroad companies and prescribing the penalty for violation thereof," it was enacted, "Section 1. That after the thirtieth day of September, one thousand nine hundred and seven, no company operating a railroad, in whole or in part, in this Commonwealth, shall demand or receive more than two cents fare per mile, or for a fraction thereof, contracted to be traveled or traveled by any passenger on such railroad in this Commonwealth; Provided, however, that the minimum fare charged by such company need not be less than five cents." Sec. 2 imposes a penalty of $1,000 for each offense upon any railroad company that shall exact a higher rate of fare than is authorized by sec. 1, and it is provided that the penalty so incurred shall be payable to the county within whose limits the illegal charge is made. The present bill was filed by the Pennsylvania Rail-

road to enjoin the enforcement of this act against it as unconstitutional.

One of the contentions of the appellee sustained by the court below is that the right to fix rates given by the act of April 13, 1846, being in the nature of a contract between the railroad and the state cannot be impaired by subsequent legislation, and the Act of April 5, 1907, P. L. 59, is, therefore, not enforceable against it. On the same day, however, that the act incorporating the Pennsylvania Railroad Company was passed, a supplement to it was approved providing that nothing in the original act " shall be so construed as in any wise to impair the right of the legislature to pass such additional laws as may be deemed expedient in furtherance of the objects contemplated by said act, and for the better enforcement of the provisions thereof : " P. L. 326.

This supplement and its effect upon the act incorporating the appellee, however, were not considered by the court below because not brought to its attention, nor have they been argued here except incidentally after attention was called to them by a member of the court. In view of our reasons for affirming the decree of the court below, it is not essential that we now pass upon this question. If it were, we would order a reargument and dispose of it. For the present we leave the immunity of the Pennsylvania Railroad Company proper from legislation fixing passenger rates at a maximum below that which its board of directors are authorized to fix by the act of 1846, that being the only point raised by this appeal, as an open question.

The exact question to be determined on this appeal, therefore, is not the general constitutionality of the act of 1907, but the right to enforce it against the appellee. The same clause in the constitution that authorized its passage provides that such legislation shall do no injustice to the corporators of any company whose charter is thereby altered. The act is, therefore, to be read as if there was incorporated in it a clause that, " This act shall not be enforced against any corporation if its provisions shall do injustice to the corporators thereof." Would the provisions of the act of 1907 do injustice to the corporators of the appellee ?

There are not wanting strong judicial expressions in this

state that whether a charter is injurious to the citizens is not a matter of arbitrary legislative opinion, and that there should at least be required the assignment of a valid ground for so declaring : Commonwealth v. Railroad Co., 58 Pa. 26 ; Hays v. Commonwealth, 82 Pa. 518 ; Williamsport Passenger Railway Co. v. Williamsport, 120 Pa. 1.   The case of Wagner Free Institute v. Philadelphia, 132 Pa. 612, dealt with exemptions from taxation, which, as there said, is always and inherently a matter affecting public interests as to which the legislative control is paramount.   The case does not close the general subject of the conclusiveness of legislative determination on the question of what is injurious to the citizens.   There may arise cases where the legislative action would be so clearly capricious and unconstitutional as to require the courts to intervene, but for the present it is enough to say that, prima facie, it is a legislative question.

But while the legislature is permitted to alter or revoke, it is prohibited from doing so in such manner that injustice will be done to the corporators.   Whether the legislature has attempted to enact a measure prohibited by the constitution is for the courts ; whether injustice has been done in any particular case is inherently and necessarily a judicial question.

The real question in the case is whether the act of 1907 transgresses the provisions of article XVI, section 10 that the legislative power to alter or annul shall be exercised only in such manner that no injustice shall be done to the corporators.

It is argued by appellee that the penalties imposed by the act for any disregard of its provisions are so great, and so out of proportion to the fault as to be evidence that they were not, in good faith intended to secure observance of the law, but to force acceptance of its terms by deterring a resort to the courts.   So regarded it would clearly be an injustice to the corporators and unconstitutional.   We do not find it necessary to pass upon this point, however, and refer to it only to avoid the inference that it is meant to be decided.

Whatever may be the law in other jurisdictions, the fundamental test in Pennsylvania is whether injustice in the constitutional sense has been done to the corporators.   The direct question has so seldom arisen that it is quite bare of authorities. In other states, and in the absence of any cases of our own, it

has been sometimes assumed that to be held invalid the provisions of the statute must be unreasonable to the extent of being confiscatory of the corporation's property or rights, and this phrase was used by the court below. But it is manifest that it is used in a special and qualified sense. The point of injustice is reached long before that of confiscation, and to make the word confiscatory really appropriate it must be read, not in the sense of producing actual confiscation, but of having an inevitable tendency thereto.

The court below after receiving much evidence and giving it a most painstaking and elaborate consideration found that the act does injustice to the corporators in that it reduces the returns from their property to such an extent as to render it unremunerative. As this is a question of fact the findings of the court cannot be disturbed unless shown to be clearly erroneous, and as this has not been shown we might well abide by the general rule and rest the case on this finding, but as the method of reaching the fact in a case of such complicated elements is complained of, it is proper to discuss some special objections.

It is claimed by appellant that the presumption in favor of the prescribed rate is very strong, and the company must clearly show that it is so unjust as to be confiscatory. The sense in which confiscatory must be understood has been already discussed. The court below conceded the general rule and held that " Any attempt by the legislature at the regulation of charges is presumptively reasonable. The burden of demonstrating its unreasonableness lies on him who objects to the regulation enacted." And further " Public service corporations in Pennsylvania are entitled to look for a rate of return, if their property will earn it, not less than the legal rate of interest, and a system of charges that yields no more income than is fairly requisite to maintain the plant, pay fixed charges and operating expenses, provide a suitable sinking fund for the payment of debts and pay a fair profit to the owners of the property cannot be said to be unreasonable : Brymer v. Butler Water Co., 179 Pa. 231." In so holding the court committed no error of which the appellant can complain. The presumption in favor of the prescribed rate is no more than the ordinary presumption in favor of the constitutionality of the acts

of assembly. It has no special strength or sanctity, and in view of the public history of the passage of the act of 1907 without investigation and in obedience to a popular agitation for the same rate not only in Pennsylvania but over the whole country, it might well be said that very slight evidence would rebut the presumption in this case.

What was said in Brymer v. Water Company, 179 Pa. 231, was that the company was entitled to a fair return, not less than the legal rate of interest. In naming the legal rate the court was naming a minimum not maximum rate. Six per cent is the legal estimate of the legitimate profit from the ordinary safe use of money. No business man in 1846, even if now, went into a new and extensive venture of uncertain outcome without the hope of more than common interest. Because his judgment or foresight was good is no reason that he should be shorn of his profits in the result. What is a fair profit is a complicated and difficult question, but there are certain elements that are plainly to be regarded to avoid injustice, such as the original investment, the risks assumed at that time, the returns as compared with other enterprises as nearly similar as may be, the cost of maintenance and improvement, the prospects of increase and the present value in view of the preceding elements. Injustice is done by anything that fails to consider these, and to deal equitably with the private as well as the public interests involved. It is not necessarily regulated by what others would now make the venture for, under the present circumstances and with present knowledge. The public having long reaped the incidental profits from the development of the country by the enterprise and venture of capital, in the increased value of land, the opening of new and wider markets for crops and manufactures and the facility of intercourse and exchange for persons and property, the courts should not now ignore this aspect of the subject in considering the question of injustice to the corporators. In view of the evidence before the court and the proper elements with which it must be considered the court below certainly did not err against the appellant in finding that the statutory rates of fare would do injustice to the corporators.

Another objection to the method pursued in the investigation of this subject is that the court confined the inquiry to the

passenger traffic instead of taking into consideration the entire traffic of every kind as appellant claims should be done.

This is the most urgently pressed of the appellant's points, but it does not carry conviction. It would be sufficient answer to say that the legislature itself in the act of 1907 has treated the passenger traffic as a separate and independent subject of examination and regulation. If the legislature may do that in ascertaining whether the charter franchise is injurious to the citizens of the commonwealth why may not the courts do the same in ascertaining whether injustice has been done to the corporators? Both are elements to be considered, and both are powers exercised under the same section of the constitution.

But independently of this, true business principles require that the passenger and freight traffic not only may, but should be separately considered. The intelligent business of the world is done in that way. Every merchant and manufacturer examines and ascertains the unprofitable branches of his business with a view to reducing or cutting them off entirely, and there is no reason why a railroad or other corporation should not be permitted to do the same thing as long as its substantial corporate duties under its franchise are performed. While the public has certain rights which in case of conflict must prevail, yet it must not be forgotten that even so-called public service corporations are private property organized and conducted for private corporate profit. And unless necessary for the fulfillment of their corporate duties they should not be required to do any part of their business in an unbusinesslike way with a resulting loss. If part is unprofitable it is neither good business nor justice to make it more so because the loss can be offset by profit on the rest. To concede that principle would, as the court below indicated, permit the legislature to compel the carriage of passengers practically for nothing though the inexorable result would be that freight must pay inequitable rates that passenger travel may be cheap. The corporation is entitled to make a fair profit on every branch of its business subject to the limitation that its corporate duties must be performed even though at a loss. What is a fair profit is, as already said, a highly complicated and difficult question. The learned court below availed themselves of all

the best evidence that was offered or shown to be attainable, considered it with exemplary patience and care, and their conclusion that the enforcement of the act of 1907 against the complainant would do injustice to the corporators is beyond just criticism.

Decree affirmed.

MR. JUSTICE MESTREZAT, dissenting :

The plaintiff and the defendant both regard this case as of vital importance, and it certainly goes without saying that the people of the commonwealth whose rights are involved in the contest fully concur with the parties to the litigation that the case is of great importance and of far reaching consequences. As the record discloses, the great and vital question involved in the case is whether the Pennsylvania Railroad Company is under and subject to the constitution of the commonwealth, as every citizen and every corporation is presumed to be, or whether that corporation is over and above the organic law of the state. The plaintiff in this action is the Pennsylvania Railroad Company and in the bill filed by it, it denies the right of the legislature to supervise its action in fixing the rate of compensation it shall receive for the transportation of passengers within the state. In pursuance of an almost unanimous demand of the people of the state, the legislature enacted the law of 1907, regulating passenger rates of transportation, and the constitutionality of that law is the primal question involved in this litigation.

It will be observed, however, that the majority of the court while conceding generally the power of legislative supervision of rates of common carriers, declines to pass upon the question of the immunity of the plaintiff company from such supervision, assigning as reasons therefor that the effect of the supplement to the original act was not argued and that the question becomes unimportant in this suit because of the view the majority takes of another question of secondary importance. With deference to the majority, I regard these reasons as wholly inadequate to justify such action, and especially so in view of the fact that there are now pending in the courts of common pleas of the state and awaiting the decision in this case other cases brought against other railroad companies

with similar charters to restrain the enforcement of the act of 1907. The question is raised at the very threshold of the appeal by the third assignment of error wherein the appellant alleges that the trial court erred in holding that " by its act of incorporation, April 13, 1846 (P. L. 312), the Pennsylvania Railroad Company received from the commonwealth the right to demand from its passengers such tolls or fares within certain maxima therein specified, as to its president and directors shall seem reasonable, with immunity from interference by any public authority with the rates that it may thus establish." Both parties, as the record discloses, regard the question as the most important in the cause and have discussed it at length. It is obvious that if such immunity exists under the charter, the question of reasonableness of the rate fixed by the act of 1907 does not arise and need not be decided. The very first important question, therefore, which confronts this court upon the record is whether the charter act of 1846 gives the plaintiff company immunity from rate legislation or supervision by the state, and I submit that the parties are entitled to an answer by this court, and that the reasons assigned for declining to decide it are entirely insufficient. It is of the utmost importance, both to the people of the commonwealth and the plaintiff company, that the question be settled finally by this court and, having been raised by the pleadings and decided by the trial court, it should now be finally adjudicated by this court. The suggestion that counsel did not discuss a part of the charter is no ground for the court not determining the plaintiff's rights under its charter. The oversight of the defendant's counsel in this respect cannot defeat the right of the plaintiff or the defendant to have a decision of the vital question in the case. If, however, by reason of this fact, the majority of the court are not prepared to dispose of the question, then the proper course, and the one universally followed, is to order a reargument and direct the counsel to discuss the question. This is the well-established practice in this court, and uniformly adopted in such cases.

Lack of time compels me to state my conclusion on the important questions involved in the case and considered and decided by the court below without quoting from the pertinent authorities which, I think, amply sustain my views.

I would hold, contrary to the rulings of the trial court :

1. That the Act of April 13, 1846, and its supplement of the same date, P. L. 326, incorporating the plaintiff company, do not give it immunity from the supervision or regulation of rates by the legislature. The power and authority under this act of assembly, claimed for the plaintiff company by its counsel, is stated by them as follows : " It will be observed that the power conferred was not to establish and receive reasonable rates ; but to establish and receive such rates. ' as to the president and directors shall seem reasonable.' The ascertainment of what were reasonable rates was thus committed to the governing body of the corporation by the legislature, and it necessarily resulted from this, it is submitted, that the legislature, itself, was deprived, by its own act, of any power or right to itself to undertake to determine what, should be reasonable rates to be established from time to time. Such power from the very nature of things could not exist at one and the same time in two bodies."

I think this is an accurate statement of the plaintiff's position, and it was sustained by the court below as to the plaintiff's line between Harrisburg and Pittsburg. The extent and consequences of such a doctrine are apparent without any extended discussion. I agree that, in the first instance, the power to regulate rates, as suggested in the position of the plaintiff, can " not exist at one and the same time in two bodies." I do not, however, concur in the view that the company's president and directors constitute a body which can control and regulate such rates without being amenable to the supervising power of the state to determine the reasonableness of the rates.

The supplement to the original act of the plaintiff company must be considered as an integrant part of the charter itself, and it clearly shows that the charter is subject to legislative control. The supplement was approved on the same day as the original act and hence became operative at the same time as the original act : Brown v. Barry, 3 Dall. 365 ; Blair v. Chicago, 201 U. S. 400. It is printed immediately after the original act in the pamphlet laws. It provides, inter alia. " That nothing in the act to which this is a supplement shall be so construed as in anywise to impair the right of the legis-

lature to pass such additional laws as may be deemed expedient in furtherance of the objects contemplated by said act, and for the better enforcement of the provisions thereof." The plaintiff company accepted this legislation as its charter, and its very language provides for legislative control and shows that such was the intention of the legislature. Every step taken and every act performed by the company have been in pursuance of both acts of assembly. The company, therefore, cannot invoke the original act as authority for exercising its corporate franchises, and deny the power of legislative supervision provided in the supplement, a constituent part of the charter.

But aside from the effect of the supplementary act upon the original act, I do not think the latter confers on the company an unlimited and unrestricted power to regulate passenger rates within the maximum rate named in its twenty-first section. If the president and directors of the company have the power to regulate rates for passenger transportation it is acquired solely through the charter from the state government. The company's charter is its life, its only source of power, and what power is not clearly delegated therein it does not possess. Did the state by the original act of 1846 confer upon the company's president and directors absolute and unqualified power, relieved of state supervision, to regulate the rates of passenger transportation, within the limits named in the twenty-first section of the act ? It is so claimed, as we have seen, and the state is now denied the right to interfere in any way whatever with any rate which the president and directors of the company may establish within the limits named in the act.

Immunity from rate regulation will not be presumed, and if a railroad company, a quasi public corporation, avers that it has such right, it must point to language in its charter which explicity and unmistakably confers the right. This principle is supported by reason, and is the doctrine announced in the decisions of the supreme court of the United States. The language employed in the charters of the companies in many of the cases in that court is very much stronger than the language used in the charter of the plaintiff company here, and yet immunity from supervision was denied. See Ruggles v. Illinois, 108 U. S. 526; Georgia Banking Co. v. Smith, 128 U. S. 174; Knoxville Water Co. v. Knoxville, 189 U. S. 434.

The original act of 1846 authorizes the president and directors of the company to establish " such rates of toll or other compensation for the use of the said road and of said motive power, and for the conveyance of passengers, the transportation of merchandise and commodities, and the cars or other vehicles containing the same, or otherwise passing over or on said railroad, as to the president and directors shall seem reasonable," with a maximum rate for through passengers of three cents per mile and for way passengers of three and one-half cents per mile.    It will be observed that there is no clear and explicit language in this provision that shows an intention on the part of the state to deny itself the right to exercise its power of supervision over the rates established by the company.    The discretionary power lodged with the president and directors is to establish reasonable rates within the maximum limit, and the plain inference is, in the absence of language declaring the contrary, that the state retains its inherent supervisory power to protect the public against arbitrary and unreasonable rates. We are not dealing with private parties to a contract, but with parties, one of which possesses sovereignty with the right to exercise it over quasi public corporations, unless that party clearly and explicitly disables itself from so doing by its contract.    The presumption, as we have seen, is against the abdication of such power and in favor of its retention by the state.    To delegate it to a corporation or to refuse to exercise it would be simply an abdication of sovereignty ; and that is never presumed : Railroad Co. v. Hecht, 95 U. S. 168.    The power to regulate rates is a power of government : Railroad Commission Cases, 116 U. S. 307, 325.    The promotion of the public welfare is the purpose of government, and to accomplish the purpose the sovereignty of the state remains with the state itself.    The supervision of transportation rates on a railroad is a question which involves the welfare, comfort and convenience of the public, and if these are to be safeguarded and secured, and unquestionably they should be, the power to do so is one of sovereignty and must be exercised by the commonwealth.    A public corporation, like a railroad, being a creature of the commonwealth has rights conferred upon it by which it exercises a part of the power of the state under state supervision, and hence it is, that enjoying those rights, it is subject to the commonwealth to the

extent that the state may control and regulate its affairs so far as the welfare of the public may demand.    In the exercise of this authority by the commonwealth, the corporation is amply protected by constitutional provisions which will not permit its property or its corporate rights to be destroyed or invaded. Those provisions require that supervisory action must be taken by the state in a way that will do no injustice to the stockholders of the corporation.    It is the imperative duty of the courts to see that the constitutional right of protection of property is as rigidly enforced in favor of a corporation as it is in the case of an individual, and a failure in either instance would be a grave dereliction of judicial duty.    It is not to be assumed that any court in the commonwealth will neglect or refuse to perform this duty.

2. I believe the power to supervise rate charges of a quasi public corporation, like a railroad company, is a police power of the state, and that the legislature has no authority to abridge it or to delegate it to a corporation or to any other body.    Section 3, article XVI, of the present constitution declares that " the exercise of the police power of the state shall never be abridged, or so considered as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals or the general well-being of the state."    This section of the constitution is simply declaratory of the implied power of the state as it existed under all former constitutions of the commonwealth.    Such power need not be reserved or declared in the written constitution of an American state, because it exists without such declaration.    This principle is recognized both by the state and federal courts.    See Com. v. Interstate Consolidated Street Railway Co., 187 Mass. 436 ; s. c., 207 U. S. 79, and cases cited in these opinions.    The legislature of the state, therefore, had clearly the right to supervise or regulate the passenger traffic on the plaintiff company's road under the police power inherent in the commonwealth. As we shall hereinafter see, the company, by its formal declaration, expressly made itself subject to the police power of the state.

3. I am clearly of opinion that in determining whether a rate for transportation is reasonable or not, all the revenues of the company should be considered, including receipts from

freight, expressage, packages and all other sources. This principle is recognized in the adjudications of the Supreme Court of the United States, and by the decisions of the Interstate Commerce Commission : St. Louis & San Francisco Ry. Co. v. Gill, 156 U. S. 649 ; Smyth v. Ames, 169 U. S. 466 ; Board of Comm'rs v. Railway Co., 7 Interst. Com. Rep. 69 ; Brabham v. Atlantic Coast Line R. R. Co., 11 Interst. Com. Rep. 464. In ascertaining a reasonable rate for the transportation of passengers, the company has no right to segregate the passenger traffic and exclude the other sources of revenue. The railroad is an entity, its being is created by a charter granted by the commonwealth declaring it " a public highway for the conveyance of passengers and the transportation of freight ; " it acts as a body, its tracks are all owned and used by the corporate entity, and its stockholders receive their dividends from the net proceeds of its entire traffic. Why, then, in ascertaining a reasonable rate for passenger traffic should the revenue from that traffic alone be considered ? The stockholders are the owners of the corporate franchises, as well as of the corporate property generally, and a fair income from the investment is what they are entitled to receive ; hence they have no right to compel the passenger traffic on their road to pay a rate of transportation which, when considered with the return from the freight and other traffic, would make an exorbitant or unfair rate to them on their investment. Their investment is in the corporate franchise and property, and the income from that investment necessarily comes from the freight as well as the passenger traffic, and, in determining what is a fair and reasonable return on their investment, it necessarily follows that the receipts or revenues from all sources should be considered. This view is strengthened by the fact that it is impossible to accurately determine what revenue the company receives from each of the several sources. The trackage, the stations, the offices and other property are owned, not by the freight department nor by the passenger department of the road, but by the company itself, and hence, in making a division of the receipts and expenditures, it is wholly impracticable to ascertain accurately and definitely the receipts from either of the several sources of revenue. As the net revenues from all sources go to the stockholders, constituting the return

on their investment, and the property from which those revenues are derived is the property of the stockholders, the fair rate or recompense for the investment in that property belongs to the stockholders, and should be counted on the entire traffic.

4. The directors of the Pennsylvania Railroad Company passed the following resolution: "That in order that the fact that this company is under and subject to the constitution of the commonwealth of Pennsylvania of 1874, adopted December 16, 1873, may be formally evidenced, this board does hereby unanimously declare that the Pennsylvania Railroad Company is under and subject to said constitution, and does hereby formally, on behalf of said company, accept all its provisions and particularly the provisions of the sixteenth and seventeenth articles thereof." This declaration and acceptance of the company was filed on March 8, 1901, in the office of the secretary of the commonwealth.

Among the provisions of the constitution which the company accepted are the following:

Section 2 of article XVI: "The general assembly shall not remit the forfeiture of the charter of any corporation now existing, or alter or amend the same, or pass any other general or special law for the benefit of such corporation, except upon the condition that such corporation shall thereafter hold its charter subject to the provisions of this constitution."

Section 10 of article XVI: "The general assembly shall have the power to alter, revoke or annul any charter or incorporation now existing, and revocable at the adoption of this constitution, or any that may hereafter be created, whenever, in their opinion, it may be injurious to the citizens of this Commonwealth, in such manner, however, that no injustice shall be done to the corporators."

Section 10 of article XVII: "No railroad, canal or other transportation company, in existence at the time of the adoption of this article, shall have the benefit of any future legislation, by general or special laws, except on condition of complete acceptance of all provisions of this article."

The language of the formal acceptance of the constitution by the Pennsylvania Railroad Company would seem to be sufficiently comprehensive to make the company subject to the entire instrument. It is said that a constitution is for the

millions, and hence should be construed as they understand it.
The acceptance declares that the company " accept all of its
provisions and particularly the provisions of the sixteenth and
seventeenth articles thereof." It is difficult to see how any
part of the instrument is without this language; or if the lan-
guage does not include every part of the constitution, how any
acceptance could be drawn which would render a corporation
subject to all the constitutional provisions. It is said, how-
ever, that section 10 of article XVI only authorizes the gen-
eral assembly to alter, revoke or annul an existing charter rev-
ocable at the adoption of the constitution, or any charters
that might thereafter be created, and that the charter of the
plaintiff company was not revocable when the present consti-
tution was adopted and hence its acceptance of the constitution
gives no authority to the legislature to alter, revoke or annul
its charter. But this is a very narrow view indeed of the ef-
fect of the plaintiff's acceptance of the constitution. It would
permit it to play fast and loose with the instrument which no
court of equity, whose assistance the plaintiff now invokes,
should tolerate in any corporation. It says broadly : "We
accept every provision of the constitution," but when the
state proceeds to act upon its acceptance and enact legislation
affecting it, it claims that it is not subject to a part of the instru-
ment authorizing such legislation and asks a court of equity to
annul the legislation. It is manifest, I think, that if the pres-
ent contention of the corporation is correct, the action of the
directors in accepting the constitution was taken in bad faith,
and with an intention to reap the benefits of subjecting itself
to the whole constitution while not rendering itself amenable
to legislation affecting it adversely. The manifest intention of
section 10 of article XVI is, upon the acceptance of the instru-
ment by a corporation, to make the corporation subject to all its
provisions in the same manner and to the same extent as though
the incorporation had taken place subsequent to the adoption
of the constitution. The tenth section must be read in con-
nection with the second section, wherein the legislature is pro-
hibited from altering or amending the charter of an existing
corporation or legislating for such corporation save upon the
condition that the corporation should thereafter hold its char-
ter subject to all the provisions of the constitution. A rail-

road company, existing at the adoption of the constitution, may secure the benefit of future legislation as pointed out in section ten of article seventeen of the instrument, which provides: "No railroad . . . . company, in existence at the time of the adoption of this article, shall have the benefit of any future legislation by general or special laws, except on condition of complete acceptance of all the provisions of this article." Here, as we have seen, if the language of acceptance, filed by the plaintiff company with the state department, is to have its usual and ordinary meaning, the company accepted specifically the provisions of the sixteenth and seventeenth articles and also " all of its (constitution's) provisions." It will therefore be observed that the plaintiff company in order to invoke the protection of the present constitution and secure the benefit of any subsequent legislation was required to declare its complete acceptance of the seventeenth article. It went further, however, and accepted all the provisions of the constitution and specifically the sixteenth article, in section ten of which, the general assembly is authorized to alter, revoke or annul any charter, then existing, revocable at the adoption of the constitution, or that might thereafter be granted.

5. The formal acceptance of the plaintiff company declares that " the Pennsylvania Railroad Company is under and subject to said constitution, and . . . . accepts all its provisions." The company, therefore, accepted section 3 of article XVI which declares that " the exercise of the police power of the state shall never be abridged, or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals or the general well-being of the state." If our position, as stated above, is correct that the regulation of railroad rates is a police power, then it follows that the act of 1907, being the exercise of that power, is, if the rate fixed is reasonable, authorized by the company's formal acceptance of the constitution.

There can be no injustice to the corporation by making it subject to the entire constitution, as the language of its acceptance declares it is. It will be oberved that the legislature can alter, annul or revoke the charter only when it is done " in such manner, that no injustice shall be done to the corporators." This gives ample protection to the corporation and

its stockholders, while at the same time it makes the constitution of the commonwealth still the supreme law of the land. It leaves the property and the franchises of the corporation fully protected, and still continues sovereignty in the state, and in the state is where it belongs.

Without discussing the reasonableness of the rate fixed by the act of 1907, I think that, under the evidence in the case, the court below was in error in finding that two cents a mile is unreasonable. The company practically concedes that a two-cent rate is reasonable by selling a mileage book for $20.00 which entitles the passenger to travel on its road 1,000 miles, or at the rate of two cents per mile. It is settled law that the burden of showing the rate named in the act to be unreasonable or confiscatory was upon the company, but the burden was not met. The average of all passenger fares, now collected by the company, is 1.907 cents per mile or .093 cents less than the rate specified in the act of 1907. The commutation rate is 1.046 cents per mile, while one way tickets are sold at 2.406 cents per mile and a round trip ticket 2.109 cents per mile. It is clear, I think, that under the evidence in the case, considering only the revenue from the passenger traffic, that the rate as fixed by the act of 1907 is not unreasonable, much less confiscatory.

I have not referred to the several legal questions raised in the record and ruled by the court below in favor of the defendant. The plaintiff has not appealed, and hence, there is nothing in the record authorizing us to consider those rulings.

The above are some of the reasons why I would reverse the decree of the court below.


MR. JUSTICE POTTER, dissenting :

I do not agree that the court below pursued the proper method in determining the reasonableness of the rate for passenger travel prescribed to railroad companies by the act of April 5, 1907. In adopting its estimate, the court took into consideration only the anticipated earnings from passenger travel, without regard to the earnings from any other source. In considering the effect of legislation, the interests of the stockholders of the railroad are beyond question to be fairly protected ; but so long as the earnings of the road from all sources

produce a satisfactory return upon the capital invested, the exact proportion which may result from the operation of any particular department would seem to be immaterial. It is not to be expected that railroad companies will earn the same percentage of profit in every department, or upon all classes of business which they may conduct. It may readily happen that the proper discharge of its duty to the public in furnishing an adequate service, may require a railroad to perform some particular service at a low price, or even at a loss; and yet the returns from the business as a whole may be entirely satisfactory.

As we understand the testimony in this case, and as shown by the last published report, the plaintiff company earned during the last fiscal year, a net profit of more than eleven and a half per cent upon its capitalization. If the estimate accepted by the court below is correct, as to the probable amount of the reduction in earnings, which will be caused by the new statute, it would not reduce the total amount more than one-third of one per cent, and it would leave a net annual return, based upon last year's business, of more than eleven per cent per annum upon the entire capitalization. Legislation permitting such a return as this can hardly be termed confiscatory, or even fairly regarded as tending in that direction. In judging the reasonableness of a rate, the interest of the party for whom the service is performed must be recognized, as well as that of the party performing the service.. The proposition that the state may impose a comparatively low rate upon a particular portion of the business of a railroad, provided the company is able to earn a fair profit upon its business as a whole, is supported both by reason and authority. For example, in Minneapolis & St. Louis Railroad Company v. Minnesota, 186 U. S. 257, it was contended that a certain rate of freight prescribed by the state railroad commission, upon coal in car load lots, was unreasonable, because it was alleged, if the same rate were imposed upon all merchandise, the road would not pay its operating expenses. But it was there distinctly pointed out by the supreme court of the United States that it might well be that other existing rates might be sufficient to earn a large profit for the company even though little came from the particular source in question.

And the power of the state was sustained to reduce the rate upon a particular article provided the company was able to earn a fair profit upon its entire business.

So also in Atlantic Coast Line R. R. Co. v. N. C. Corporation Com., 206 U. S. 1, the supreme court of the United States upheld the right of the state to compel a railroad company to perform a particular duty, the running of an additional train necessary for the convenience of the public, even though it entailed some pecuniary loss.

It appears also from the reports of the Interstate Commerce Commission, that it is the practice of that body, in determining questions of the reasonableness of railroad rates, to take into consideration the entire earnings, operating expenses and fixed charges of the road under consideration. This was done in the case of passenger rates in Brabham v. Atlantic Coast Line R. R. Co., 11 Interst. Com. Rep. 464 (1905). In the opinion in Artz v. Seaboard Air Line Ry. Co., 11 Interst. Com. Rep. 458 (1905), a case of passenger rates, it is said (p. 462): "The reasonableness of the passenger fare upon a particular part of the defendant's system must be determined with some reference to the system as a whole."

The same practice prevails in determining the reasonableness of freight rates. See Matter of Freight Rates, 11 Interst. Com. Rep. 180 (1905); Rates from St. Louis to Texas Common Points, 11 Interst. Com. Rep. 238 (1905); Matter of Proposed Advances in Freight Rates, 9 Interst. Com. Rep. 382 (1903). Under this rule the entire earnings of the plaintiff company within the state should have been considered in the present case. Had this been done, it would without doubt have appeared that the rate imposed by the act of 1907, will not prevent the company from earning a fair profit upon its entire business. For this reason I would reverse the decree of the court below and dismiss the bill.

Mr. Justice Stewart, dissenting:

In expressing my dissent from the conclusion reached by the majority of the court, I shall not attempt any discussion of the very serious and important question which was given such prominence on the argument of the case, namely, whether a corporation having by the terms of its charter the right to

fix and determine within certain defined limits its charges for transportation, the charter containing no provision for its repeal, alteration or amendment, can be required by legislative enactment to observe a rate lower than the maximum charge allowed by the charter. I avoid the question for the reason that in my opinion it is in nowise involved in the present case. Nor do I think it necessary to attempt a vindication of the right generally of the legislature to regulate the charges of railroad companies for transportation. Whatever difference of opinion there may be as to the policy of such legislation, there can be none as to the power of the legislature in this regard, when exercised within constitutional limitations. If anything can be regarded as settled by multiplied uniform decisions, both federal and state, this power ought to stand clear of impeachment. I shall assume it. The contention of the plaintiff in the court below, and repeated here, is that the particular enactment, the subject of present inquiry, the act of April 5, 1907, entitled "An act to regulate the maximum rate and minimum rate to be charged for transportation of passengers by railway companies," etc., transgresses constitutional limitations so far as it is made to apply to the plaintiff, in that it violates a contract between the state and the corporation, by which the right was granted to the latter to charge, at the discretion of its president and board of directors, as much as three and one-half cents per mile for each passenger carried ; and again, in that the rate fixed by the act for such transportation would be unremunerative to the company, with the result that to compel its observance would in effect be a taking of the company's property without making just compensation. These are the questions, and the only questions, involved in the case. I shall consider them briefly.

That a charter constitutes a contract between a state and the corporation erected thereunder is no longer an open question, and it may be conceded, for present purposes, that if the charter of this company, granted in 1846, contains no reservation to the state of the right to alter or amend it, it is such a contract as is protected by the constitution against legislative impairment. But I am of opinion that no such contract has been shown in this case. The act of April 13, 1846, which it is insisted is the plaintiff company's charter, is but a part of

that charter. Before the conditions on which the right of the parties named in the act to become incorporate depended could have been complied with, indeed, on the very same day the act was approved, a supplement thereto was likewise approved. Upon the argument of the case this supplementary act was called to the attention of counsel, but for some unexplained reason it was passed over as of no importance in the inquiry. The fact that counsel chose to ignore it does not relieve us from the duty of considering it, except as we concur in the finding by the court below to the effect that the prescribed rate is less than compensatory. Holding to the view that such finding is without warrant, there can be no proper determination of the case except as it is considered. Its consideration is thus forced upon us. I cannot but regard the supplement as essential a part of the charter as the original act. When it was passed the corporation had no existence; the original act did not create it, but merely indicated a mode or manner by which it might thereafter be created. When subsequently letters patent were issued creating the corporation, the acceptance of these letters was the voluntary subjection by the corporation of itself to the provisions of both acts. The corporation had no right of election as between them; both together constituted the law of its organization. It was under no contract obligation to accept the letters patent, was at perfect liberty to refuse them, but, having accepted them, it must be held to have accepted them with full knowledge of and acquiescence in whatever restrictive legislation then existed. By this supplement the right of amendment and alteration is reserved in unmistakable language. It provides: " That nothing in the act to which this is a supplement can be so construed as in anywise to impair the right of the legislature to pass such additional laws as may be deemed expedient in furtherance of the objects contemplated by said act, and for the better enforcement of the provisions thereof." How can it be asserted in the face of this distinct and unqualified reservation of power that the act of April 5, 1907, violates the terms of the contract between the state and the corporation? As I have already pointed out, when the supplement became a law the corporation did not exist. If it be said that the contract was with the parties named in the act for the benefit of the corporation

thereafter to succeed, the answer to that is, that before their assent or acceptance could have been expressed in anyway, before they did anything under the act, or paid a dollar on the faith of it, the supplement was in force. Not only so, but a reading of the act makes it very clear that the act committed the state to nothing except as the preliminary conditions prescribed were complied with. Until these conditions were met no contract relation could arise; until then the act was nothing more than an offer to incorporate on certain conditions which the parties named could accept or reject as they pleased. Certainly, in a dispute between individuals no contract could be inferred except as mutual agreement was shown; a proposition made by one to another is wholly within the control of the one making it, for withdrawal or amendment, until the moment of its acceptance by the other. Why should not the same rule apply where the effort is to hold the state bound by a contract? The construction I contend for does no injustice either to the corporation or the parties named in the act. The latter entered upon the work of securing subscriptions of stock as required, knowing that the supplement had passed; and every individual subscriber is held to knowledge of the same fact.

With quite as little reason can it be argued that the reservation of power as expressed in the supplement is not ample to warrant the act of April 5, 1907. The power reserved is the power to pass such additional laws as may be deemed expedient in furtherance of the objects contemplated by the act. Can there be any question as to what these objects were? It will not be contended that the object of the act was to confer benefit or advantage on the corporation. That it would derive profit was contemplated of course; but this was an inducement, not to the passage of the act, but to enlist the corporation in the work of accomplishing the objects the legislature had in view. These objects were purely of a public character, the building of a great highway across the state for the advancement of the interests of the state in manifold ways, not the least of these being the rapid and convenient transportation of persons and goods at reasonable cost. To secure these ends to the general public for all time, the legislature reserved to itself the power to pass such additional laws as might there-

after be required. The act of April 5, 1907, is a legislative conclusion, which we have no right to disturb, that in order to secure to the public transportation at reasonable cost, an additional law was required. The act itself is clearly within the scope of the reservation. This course of argument may not be as convincing to others as to myself; but if it be enough to raise a doubt as to the correctness of the plaintiff's contention, the doubt is to be resolved in favor of the state, not against it. This rule will not be questioned.

I am unable to see in the evidence any sufficient support for the finding of the court below with respect to the other branch of plaintiff's contention. In an issue such as this, the burden of proving that the maximum rate fixed by the act would not yield what the law regards as just compensation for the service rendered, rests upon the plaintiff; and this burden is not discharged except as the evidence adduced to prove the fact alleged is strong enough to support a judicial determination in favor of the plaintiff, not on the overcoming of an adverse presumption, nor yet on a preponderance of proof, but on the ground that the facts alleged have been established beyond reasonable doubt. I do not state it too strongly, for upon this one fact rests this contention. If the fact be as averred by the plaintiff, the unconstitutionality of the act follows necessarily; and, therefore, it is that the proof required to establish the fact must measure up to this high standard before it can avail. Speaking of the power and duty of the court to declare a law void when it violates the constitution, Tilghman, C. J., in Bank v. Smith, 3 S. & R. 63, says, "It is a point on which I am well satisfied; but at the same time it is certain that it is a power of high responsibility, and not to be exercised but in cases *free from doubt.*"

In Sharpless v. City of Philadelphia, 21 Pa. 147, Black, C. J., uses this language, "There is another rule which must govern in cases like this; namely, that we can declare an act of assembly void, only when it violates the constitution *clearly, palpably, plainly,* and in such manner as to leave *no doubt,* or hesitation on our minds." The italics in neither citation are mine.

In Railroad Company v. Casey, 26 Pa. 287, the same eminent judge says: "The party who wishes us to pronounce a

law unconstitutional takes upon himself the burden of proving, beyond a reasonable doubt, that it is so."

In Penna. R. R. Co. v. Riblet, 66 Pa. 164, SHARSWOOD, J., says : " Nothing but a clear violation of the constitution—a clear usurpation of power prohibited—will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void."

But why multiply authorities in support of a rule so long established and universally allowed ? I would not have burdened this opinion even to the extent of the above citations, but to put in stronger light the impotence and insufficiency of the finding of fact by the court below to sustain the plaintiff's contention. Written across the very face of the court's finding is an admission that it is based, not on facts ascertained, but upon a mere probability. I quote the finding : " 2. Since the reduction to the rate of two cents per mile fixed by the act of April 5, 1907, of all fares now established on a higher basis would probably have the effect of reducing the profits of the plaintiff from the interstate passenger business to a sum equivalent to less than two per cent on its investment in the facilities necessary for carrying that business on; and since a return so small is not fair remuneration for the use and risk of its property : Brymer v. Butler Water Co., 179 Pa. 231, the regulation attempted by the Legislature in that Act must, so far as it relates to the plaintiff, and for so long as the present conditions continue, be adjudged to be unreasonable."

To make it absolutely conclusive that the court intended that it should be so understood, I quote from the discussion leading up to the finding above : " In our opinion, the approximation and probabilities worked out upon the broad foundation of established facts by men of experience and sound judgment, testifying under oath, may properly be considered a safe ground on which to base judicial action." Not only was the high power of the court to declare an act of the legislature void, here exercised to this end on a mere probability that it violated the constitution, but even this probability admittedly is not an inference derived from facts judicially determined, but from facts which witnesses in the case say they determined for themselves, by methods of investigation which they themselves approved. How indifferent this ruling is to the

rights of a co-ordinate branch of government, contrasted with the jealous regard for such rights shown in the cases I have cited, and what a departure it is from those settled principles governing judicial determination in questions of this character universally recognized, need not be here remarked upon, except to say, that receiving the sanction of this court the case will establish a precedent fraught with extreme danger. Others may see their way clear to sustain this finding by the court and the nullifying decree based thereon, but for myself I cannot. An examination of the evidence in the case will show that it but feebly supports the finding even as to the probability. To me it is not convincing in any degree, for the reason that the calculation by which it is sought to establish the probability is based, not on ascertained facts, but upon arbitrary assumptions and apportionments, the fairness and accuracy of which cannot in the nature of things be established with any degree of certainty. A common capital has supplied common facilities for the transportation of passengers and freight. How can it be determined, with any degree of exactness, how much of that capital is invested for the carriage of passengers and how much for the carriage of freight? Both are carried on the same roadbed, over the same bridges, the same rails, and in many cases are discharged at the same stations. How can there be any apportionment of expenses, for service, insurance, taxes, and a dozen others things which have been met out of the common fund, except an arbitrary one to suit the purposes and convenience of the company in connection with its accounts? Any calculation by such method must start with and proceed on the assumption of facts which, as I have said, cannot in the nature of things be established. If it be said that the plaintiff is shut up to such method of proving the fact it complains of, and that unless it be allowed to show it in this way, it is helpless against legislative injustice, a sufficient answer would be—show this to be so, and the company will at least be in better position to insist upon the method adopted. I think it quite evident that it is not so. The question whether a given passenger rate will yield a compensatory return for the particular service rendered, may be curious and interesting, but the fact, however it be, can be of no practical value in determining the larger question of whether the state is con-

fiscating the company's property by compelling it to observe such rates. If the rate be less than compensatory in itself, yet if the entire net income of the company derived from both branches of its business in the operation of its road, is sufficient to yield to the company a reasonably fair return on its capital, is the company in any position to claim that injustice is being done it? Let us see—If the whole income derived from both branches of the company's business yields a compensatory return on the whole capital, and one branch be shown to have been conducted at the loss, it would seem to follow necessarily that in conducting the other branch, the company had exacted from the public rates which were more than compensatory, and, therefore, unreasonable and unjust. If the fact be so—I do not say that it is—then the plaintiff company is here with one outstretched hand appealing to a court of equity to protect it against legislative injustice, while with the other it is working injustice like unto that of which it is complaining, against the people whose servant the legislature is. If it be not so, it is within the power of the company, at no inconvenience to itself, and by the simplest process, to acquit itself of all suspicion in this regard. Were a court of equity, dealing only with conscionable demands, to insist that the company at least make a reasonable effort to do so, would it be requiring too much? Certainly not; it is the judicial conscience that is to be satisfied before the relief asked for can be given. I have said that it was in the power of the company to demonstrate, if it chose to do so, that the prescribed passenger rate is not compensatory, if indeed such be the fact. Let us assume the freight rates of the company to be compensatory and nothing more—the only assumption that is required to be made, and the plaintiff will certainly not insist that it is an unwarranted one. Let the total net income from both sources of revenue for a given period, be reduced by whatever sum will represent the difference between the net passenger income on the basis of the company's rates and the rate prescribed by the act. If the result be a reduction of the total net income below what would be compensatory to the plaintiff, it will show unmistakably that the fault is in the prescribed rate. If the working hypothesis employed for this solution be established as the fact, namely, that the freight

rates were simply compensatory and nothing more, the plaintiff will have made out a case upon which no court of equity would turn its back. Until this is done, it would be the extremest indulgence to allow that the plaintiff's evidence establishes even a case of reasonable probability.

It is impossible to avoid these necessary conclusions except as we apply to the case the doctrine asserted in the majority opinion, and which, I venture to say, is here for the first time advanced, namely, that legislation, having for its purpose the regulation of corporations, may reach the point of injustice, within the constitutional intendment, and, therefore, the point where there may be judicial interference, short of actual confiscation of the corporate property or corporate rights. The position here taken is to my mind wholly untenable. By express constitutional provision the right is conferred upon the general assembly to alter, revoke or annul any charter of incorporation whenever, in their opinion, it may be injurious to the citizens of the commonwealth. The power here given subjects every corporation to legislative regulation and control, even to extinguishment, and the legislature is made the sole judge as to when occasion arises for its exercise. The provision that the power is to be so exercised that no injustice shall be done the corporators, in no way qualifies the right of the legislature to determine for itself when and to what extent, in any given case, it shall exercise the power. The injustice the constitutional provision avoids, is confiscation,—the forfeiture of the property and property rights of the corporation to the public without due compensation; it contemplates something that can be judicially determined by settled principles, and measured by established legal standards, with a view to reimbursement or indemnity. Under the provision referred to, the power of the legislature to pass such legislation as it may deem necessary to protect the people of the commonwealth from corporate oppression, can never become a judicial question where provision is made for full compensation for any injury that may result. The position taken in the majority opinion is away in advance of anything asserted by the plaintiff. Its contention, upon the argument of the case, was that the act of April 5, 1907, was confiscatory, in that it would require the company, without indemnity from the state, to ren-

der a public service at less than compensatory rates. This contention gave it a standing in court; on the bare contention that the legislation was unjust to it in any other sense, it could have none. As I have tried to show, its proof failed to make good its contention, and it is, therefore, not entitled to the relief prayed for.

But this opinion has grown beyond the limits I intended it to have. My purpose was simply to indicate the grounds on which I would sustain this appeal, and the reasons therefor. Beyond these I have not gone. For the passage of the law in question we have no responsibility and I express no opinion in regard to its policy, or the wisdom of its provisions. I recognize the duty resting on the court in every case where the power of the legislature to enact a law is called in question, to maintain the supremacy of the constitution, and declare void the act of assembly that violates it. But this high power invested in the court, as has been said, is attended with high responsibility. It is to be exercised only when the legislation transgresses an expressed constitutional restriction, or one necessarily implied, " palpably, plainly, and in such manner as to leave no doubt or hesitation on our minds."

Aside from the narrow field from which legislative power is excluded, there is a vast domain in which legislative discretion is supreme, subject to no review except the repealing power which abides in the people. Into this domain we may not enter with our nullifying decrees. Any invasion of it by us would be nothing more or less than an attempt to subject legislative discretion to arbitrary judicial power.

For the reasons given I would sustain this appeal.